Argued June 1, affirmed June 16, 1971

KALLSTROM, *Respondent, v.*
O'CALLAGHAN ET UX, *Appellants.*

485 P2d 1200

In Banc

Glen Hieber, Judge.

*Carlton D. Warren,* Portland, argued the cause for appellants. With him on the briefs were Solomon, Warren & Killeen, Portland.

*Jack L. Kennedy,* Portland, argued the cause for respondent. With him on the brief was Gerald R. Pullen, Portland.

TONGUE, J.

This is a suit for specific performance of an "option agreement" to purchase a two acre parcel of land.[1] Defendants appeal from a decree ordering them to perform their obligations under the agreement, including the execution of a deed conveying the property to plaintiff.

Defendants contend on this appeal: (1) that the "option agreement" was invalid for lack of consider-

---

[1] The suit was also to reform a mistake in the address of an adjacent tract of land, as referred to in the same option agreement. It was conceded, however, that plaintiff was entitled to have the agreement reformed to correct that mistake.

ation; (2) that it was also invalid for lack of a proper description of the land involved, and (3) that the real estate broker who negotiated the transaction lacked authority to act as defendants' agent.

The "option agreement" which gives rise to this controversy, as prepared by a real estate broker and signed by both parties, provides as follows:

> "WHOM IT MAY CONCERN
> 28 June, 1968
> The undersigned Harriet M. Kallstrom, an unmarried woman, does hereby offer the sum of $5,000.00 as option consideration to Patrick T. O'Callaghan, et ux, for the approx. 2 acre parcel located directly North and contiguous to 17905 S.W. Boones Ferry Rd.—Tualatin, Oregon. Said option to run for 30 months from date of acceptance and may be exercised any time after 1 Jan, 1969, for a price of $16,500.00 with the full option consideration to apply and balance in not more than 3 years, payable quarterly plus 8% interest on the unpaid balance from date of exercise of option. Optionor to pay taxes until option exercised.
>
> /S/  HARRIET M. KALLSTROM
> Accepted 10 July, 1968
>
> BY:  /S/  PATRICK T. O'CALLAGHAN
>      /S/  CLAIRE H. O'CALLAGHAN"

The facts and circumstances under which this agreement was prepared and signed are important to a determination of all three issues presented for decision.

Defendants were the previous owners of the property. They had been investing in real estate for several years. They met the real estate broker, Mr. Stanley G. Harris, as students in a course given by

him in real estate investment. During the next two years they were regarded by Mr. Harris as "clients" and he sold several parcels of land for them. He described them as "very knowledgeable real estate investors." During this same period Mr. Harris also managed property for defendants. They also dealt through other realtors and dealt mostly in apartments and rental property.

Although there was no written listing agreement or agency agreement between defendants and Mr. Harris at the time of the transaction involved in this case, he had apparently acted for some time on their behalf without any written agreement. Mr. Harris testified that he also did so for about 150 clients and that as of June 1968 there was "a definite client-agent relationship" between himself and defendants.

The two acre parcel in controversy was originally part of a five acre parcel in Washington county previously purchased by defendants for some $30,000. It included an old schoolhouse which had been converted into a seven unit apartment house and named "Tualatin Gables." Its address was 19705 S.W. Boones Ferry Road, Tualatin, Oregon. In 1967 defendants, through Mr. Harris as real estate broker, sold three acres of this parcel, including the building, to a Mr. Henry under a contract of sale for $42,500. Mr. Harris continued to act as agent for defendants in collecting the payments under that contract and deposited such payments in a trust account for them. He also continued to manage the "Tualatin Gables" apartments on behalf of Mr. Henry.

At that time, and on advice of Mr. Harris, the five acre parcel was divided and the remaining two acre parcel was retained by defendants and was also made available for sale. Mr. Harris testified that

although he had no written listing agreement for sale of that parcel there was a "tacit understanding to that effect." Both the two acre parcel and the three acre parcel (including "Tualatin Gables") fronted on Boones Ferry Road and the two acre parcel was immediately north of the three acre parcel and was contiguous to it. At that time defendants had a single mortgage covering the entire five acre parcel.

Shortly after sale of the three acre parcel to Mr. Henry defendants complained to Mr. Harris that Mr. Henry was slow in making contract payments. They were also concerned with his "financial capacity." Apparently the apartments needed a new furnace and he did not have funds for that purpose. Mr. Harris then talked to defendants about "upgrading" the apartments and, for that purpose, getting a "stronger buyer" on that contract of sale.

At that time Mr. Harris knew plaintiff, who had also been a student in one of his classes and was considered by him to be a "hot prospect." She had recently been divorced, had her former home for sale and had asked Mr. Harris for advice in investing the proceeds. Harris told plaintiff that both the three acre parcel, with the apartment building, and also the two acre parcel were for sale and that it would be to everyone's advantage "if both packages could be put back together" as "one package." He then discussed the proposed sale of both parcels with Mr. Henry and defendants. As previously stated, Harris had been dealing with defendants as their agent, without written listing or agency agreement. He testified that he also had an "unwritten listing agreement" with Mr. Henry. Accordingly, Harris told plaintiff that he represented both owners, but did not show her any written listing agreements.

At that time plaintiff told Harris that she was not interested in either parcel separately, but only in the "total" five acre parcel. This was apparently because, as he testified, "it is a well-known appraisal principle that the value of real property is increased by what is known as the 'package increment' when two or more parcels are put together as a larger tract for future development." This was also important to plaintiff because more additional apartment buildings could be built on the larger parcel than could be built separately on the two parts of that parcel. Harris testified that he also discussed with defendants the fact that the sale of the two acre parcel "was dependent upon Mrs. Kallstrom purchasing the three acre parcel."

Mr. Harris then proposed that the sale to plaintiff of the entire five acre parcel be accomplished in two ways: (1) by a deed from Mr. Henry to plaintiff of his interest in the three acre parcel (instead of an assignment of his vendee's interest in the contract of sale) and, (2) by an "option agreement" between plaintiff and defendants for purchase of the two acre parcel. The primary reason for proposing an "option agreement" for the two acre parcel, as explained by Harris to defendants, was that the "tax consequences" of an outright sale in 1968 "would have eaten into the available profit," whereas by using an "option agreement," not to be exercised until after January 1, 1969, defendants "would be able to defer tax consequences," because an option is not taxable until it is exercised.[2]

---

[2] Other reasons, as stated by Harris, were that there was a balance due under the mortgage on the entire five acre parcel, which would have to be cleared before good title could be conveyed to the two acre parcel and that by using an option defendants would have the use of the option payment of $5,000 in 1968, but would be able to defer the tax consequences until 1969.

This was in accord with defendants' position that they "didn't want this transaction (for the two acre parcel) unless the tax could be deferred until the following year."

Mr. Harris then prepared the "option agreement" which gave rise to this controversy. It was signed by plaintiff on June 28, 1968. It was also signed by defendants on July 10, 1968. Before signing the "option agreement" the problem of deferring taxes on the sale of the two acre parcel until the following year was discussed by Mr. Harris with defendants. Mrs. O'Callaghan testified that Mr. Harris told defendants that they could verify what he had told them about the tax consequences by contacting their CPA or that he would do so and have the CPA call them. Mrs. O'Callaghan also testified that she told Harris that the transaction was dependent upon getting such a verification from her accountant, and was not binding until then. Harris, however, denied that the transaction was dependent upon consulting the CPA and said that he had already "checked it" on defendants' behalf and found that "it was not taxable in 1968." He also denied that the "option agreement" was intended only as a "temporary agreement" pending preparation of a formal contract, as testified by Mrs. O'Callaghan. In any event, at that time defendants signed the "option agreement" as prepared by Harris.

Plaintiff testified that Harris told her that defendants signed the "option agreement" and did not tell her that it was "contingent upon anything." She then proceeded to complete the "one transaction" by payment to Harris of $20,000, including $15,000, as required to close the purchase of the three acre parcel and also, and at the same time, the sum of $5,000 pay-

able as the "option consideration" for the two acre parcel.

On August 7, 1968, Harris deposited the $5,000 in a trust account for defendants. He testified that it was then available to them and that he called them to say that it had been paid and was deposited in their account.[8] He also testified that defendants did not at that time say that they did not want to go through with the transaction, but only that they were checking with the accountant.

By letter dated September 23, 1968, the accountant wrote to Mr. Harris, agreeing with his position that the tax consequences of the "option agreement" for sale of the two acre parcel would be deferred until 1969. A copy of that letter was sent to defendants and received by them on or about September 24th or 25th. Mrs. O'Callaghan then called Mr. Harris and told him that they had "changed their minds" and was told by him that they could not do so. She also told Harris that she had not received the $5,000, which had been previously deposited by him in a trust account for them, although admitting that she had never asked him for the $5,000.[9] Mr. Harris, however, did not then notify plaintiff of these problems because he did not know "for sure" that defendants were not going to proceed with the sale. Defendants also admitted that plaintiff did not do anything to cause them

[8] Defendants admitted that Harris called and said that he had the $5,000 on deposit, but denied that he told them it was deposited in their account or in an account available to them.

[9] Also, by letter dated September 24, 1968, defendants' attorney notified Mr. Henry that he was in default of his contract and also stated that defendants were "not willing to complete pending negotiations" for the two acre parcel.

to "change their minds" and to renege on the agreement.

After some further controversy between Harris and defendants relating to collections by him under the Henry contract, defendants' attorney, by letter to Harris dated November 25, 1968, notified him that his authority as agent for defendants was revoked, except to receive payments under the Henry contract.[8] Harris testified, however, that his authority to act as agent for defendants had not been terminated prior to signing the "option agreement" and payment of the $5,000 by plaintiff.

Meanwhile, plaintiff had completed the purchase of the adjoining three acre parcel. Subsequently, she also authorized her attorney to exercise the "option" for purchase of the adjacent two acre parcel and to tender the sum of $11,500 as the balance of the purchase price for that parcel, and this was done by letter dated April 15, 1969.[9]

1. *There was sufficient consideration for the "option agreement."*

1. Defendants contend that by the terms of the "option agreement" the sum of $5,000, although referred to as "option consideration," was not to be forfeited upon failure to exercise the option, but was to be applied to the purchase price as an "advance down payment" upon exercise of the option and otherwise was to be returned to plaintiff. Thus, it is contended

---

[8] That letter also stated that "the negotiations thus far carried out have not resulted in a valid or any option."

[9] Plaintiff also complained that a balance was still due under the mortgage on the entire five acre parcel. In addition, there was testimony that the value of the five acre parcel had increased since the date of the "option agreement."

that the option is invalid under *Aspinwall Executrix v. Ryan et al,* 190 Or 530, 226 P2d 814 (1951), which held that an option which fails to state an independent consideration for its execution, as opposed to an "advance down payment" results in nothing more than an offer which may be revoked at any time for failure of consideration. In *Aspinwall,* however, the option agreement specifically provided that the $100 paid by the optionee was to be credited on the purchase price as a part payment and did not refer to it as "option consideration," as in this case. To the same effect, see *Friendly v. Elwert,* 57 Or 599, 601, 105 P 404, 111 P 690, 112 P 1085 (1911), and *Mossie v. Cyrus,* 61 Or 17, 19, 119 P 485, 119 P 624 (1912).

Plaintiff, on the other hand, relies upon *Kingsley v. Kressly,* 60 Or 167, 111 P 385, 118 P 678 (1911). In that case we held that even though the money paid for the option was, by the terms of the option agreement, to constitute a part of the purchase price upon exercise of the option, nevertheless, if that money was to be retained by the optionor if the option was not exercised, so as to be "plaintiff's money in either case," the option agreement was supported by sufficient consideration. In *Kingsley,* however, the option agreement specifically provided that the $2,000 was to be retained by the optionor until balance of $18,000 was paid.

The "option agreement" in this case does not expressly provide, as in the *Kingsley* option, that the payment by plaintiff was to be retained by defendant if the option was not exercised by plaintiff. On the other hand, this agreement, contrary to the *Aspinwall* option, did specifically refer to that payment as "option consideration."

James on Option Contracts (1916) 139, § 322, after referring to cases involving "option agreements" which specifically provide that the payment made by the optionee should be retained by the optionor if the purchase was not completed, goes on to state that:

> "So, also, where there was an option reciting the receipt of $10 as a deposit and providing for the payment of the balance of $560 on delivery of the deed, although there was no express stipulation forfeiting the deposit to the optionor in the event of the failure of the optionee to elect. [Citing cases]."

James goes on to state (at 150-52, § 331) that while a recital of consideration in a contract not under seal is "not conclusive," parol evidence is admissible "either to show want of any consideration or what the real consideration is" and that "the burden is on the party challenging it to prove want of consideration."[⊘]

Much to the same effect, the more modern text of 1A Corbin on Contracts (1963) 499, § 263, states that:

> "* * * Frequently, an option to buy land is given in consideration of a sum of money that is to be regarded as a part of the total purchase price in case the option holder later elects to buy. Whether or not it is to be so regarded is a question of interpretation of the words of the option giver.

---

[⊘] James also, at 140, § 323, n.2, makes the following comment on *Friendly v. Elwert, supra,* and *Mossie v. Cyrus, supra,* which first stated the rule subsequently relied upon in *Aspinwall:*

"The text is based on the Oregon case cited, but it would seem the rule should be limited to cases where, by the terms of the option, the optionee may arbitrarily reject the title. If the optionee may not reject the title except upon some ground sufficient in law, that is, on the ground that the title is not marketable within the rule, it is not apparent why deposit or payment on the price, in such case, is not a consideration, even though it is to be returned to the optionee in the event the title is found unmarketable. See *Simmons v. Zimmerman,* 144 Cal. 256, 79 P. 451, 1 Ann. Cas. 850."

Sometimes those words are not very clear on the point. ※ ※ ※."

Corbin goes on to state (at p 539, § 266) that:

"An option to buy or sell is frequently given as a part of a larger contract with other purposes; and a consideration sufficient to make the option binding and irrevocable may be found in the consideration that the optionee gives in that larger contract. ※ ※ ※"

And (at p 603, § 274) it is stated that:

"There are many cases in which an offer to buy or to sell on stated terms has been made and it cannot readily be determined whether or not the other party has made, either expressly or by implication, a return promise to sell or to buy. The problem is almost wholly one of interpretation. ※ ※ ※"

To much the same effect, it was held by this court in *Olympia Bottling Works v. Olympia Brewing Co.*, 56 Or 87, at 91, 107 P 969 (1910), that the option agreement in that case "must be construed with the entire contract." See also *Bogard v. Barhan*, 56 Or 269, at 276, 108 P 214 (1910), and *Johnson v. Homestead-Iron Dyke Mines Co.*, 98 Or 318, 329, 193 P 1036 (1920).

Applying these rules of law to the facts of this case it is important to note that this "option agreement" was not an isolated transaction. Instead, it was one part of a two-part transaction involving both the purchase of the three acre parcel from Henry, as well as purchase of the two acre parcel from defendants so as to reunite them in the original five acre parcel. Plaintiff was not interested in purchasing either parcel separately. Indeed, plaintiff, in reliance

on the "option agreement," incurred the "detriment" of completing the purchase of the three acre parcel and obviously intended to proceed with purchase of the two acre parcel. The only reason she did not do so at that time was to make possible a tax benefit to defendants which required that the purchase of the two acre parcel not be completed until January 1, 1969.

Conversely, defendants were interested both in getting a "stronger purchaser" for the three acre parcel, as well as in selling the two acre parcel, which obviously would be sold at best advantage to the purchaser of the three acre parcel. Thus, defendants, as a part of the entire transaction, of which the option was a part, derived the "benefit" of having plaintiff take over the purchase of the three acre parcel and, again, defendants' only reason to defer completion of the sale of the two acre parcel to plaintiff was to gain a tax advantage that would not otherwise accrue to them. In addition, as testified by the real estate broker who conceived of the entire arrangement and prepared the "option agreement," defendants were to have the benefit of the use of the $5,000 in 1968, although that payment would not be taxable to them until the option was exercised in 1969.

Under these circumstances, and considering the reference in the "option agreement" to the payment of $5,000 as "option consideration to Patrick T. O'Callaghan et ux," we hold that defendants failed to sustain their burden to prove that there was a want or failure of consideration and that, on the contrary, there was adequate consideration for the "option agreement" so as to make it a binding option contract for a period of 30 months, subject to exercise by plaintiff upon completion of the purchase at any time after January 1, 1969.

## 2. *The land description in the "option agreement" was sufficiently definite.*

2. Defendants contend that the description in the "option agreement" referring to "the approx. 2 acre parcel located directly North and contiguous to 17905 (corrected to 19705) S.W. Boones Ferry Rd.—Tualatin, Oregon" was not sufficiently definite to satisfy the statute of frauds, ORS 41.580. More specifically, although defendants concede that "a less strict rule is applicable to real broker's contracts" under *Sherwood v. Gerking,* 209 Or 493, 509, 306 P2d 386 (1957) (involving a listing agreement), defendants contend that it is nevertheless required that such a description be sufficient to enable one, with the aid of extrinsic evidence, not only to locate the property, but to identify it.

Thus, defendants contend that while descriptions referring to "my" or "his" property or to the "Harold Gerking Ranch" may be sufficient under the decisions of this court, the "option agreement" in this case contains no such language, but is substantially the same as the description held to be insufficient in *Coast Business Brokers, Inc. v. Hickman,* 239 Or 121, 396 P2d 756 (1964). That case held the following description to be insufficient: "Also two tracts of land, one of five acres and one of seven acres, adjoining Honeyman park, south of Florence."

In *Coast,* however, the direction of the tracts involved from Honeyman Park was not stated and there may well have been more than two tracts of land adjoining that park. In this case, on the contrary, the parcel in question was referred to as "the approx. 2 acre parcel located directly North and contiguous" to

a tract located at a specific address on a named road and community in Oregon. Furthermore, extrinsic evidence showed that the two acre parcel in question was the only parcel of land directly north of and contiguous to the tract located at that address.

Under these facts we hold that our previous decision in *Coast* is not controlling in this case, but that the "option agreement" sets forth a sufficiently definite description within the rules previously established by this court.

In *Burns v. Witter*, 56 Or 368, 108 P 129 (1910) (although involving a description which referred to "my farm containing 40 acres"), this court (at p 373) quoted with approval from *Lente v. Clarke Adm'x*, 22 Fla 515, 519, 520 (1 So 149, 151), the following rule:

" 'The rule is that the contract or memorandum must identify or point out a special tract of land *as within the minds of the parties,* and intended to be conveyed. It must so describe the land as it can be found, or located, or in other words, *there must be such a description as can be applied to a particular piece of land as the subject of the contract.* A detailed description is not necessary. Where the description shows that a particular tract as distinguished from other lands is meant, then parol evidence can be resorted to, to apply the description, or identify or locate the land, though the description be somewhat general. *However precise the description, a resort to parol evidence for such purpose is always* necessary. * * *' " (Emphasis added)

Subsequently, in *Sherwood v. Gerking, supra,* at p 510, (although involving a description referring to the "Harold Gerking Ranch") we also quoted (at

p 510) with approval a similar rule, as stated in *Gifford v. Straub,* 172 Wis 396, 179 NW 600 (1920):

> "It has been many times decided in cases arising under the statute of frauds that an indefinite description does not render the contract invalid if by extrinsic evidence the land conveyed can be made certain.
>
> "The writing relied on to establish the contract need not describe the land which is subject to sale *otherwise than by a reference therein to some extrinsic fact by means of which the land can be known with sufficient certainty.*" (Emphasis added)

More recently, in *Higgins v. Insurance Co. of North America,* 256 Or 151, 469 P2d 766 (1970), we sustained the description in an earnest money receipt in which the space provided for a description of the property was filled in as follows: "description to be furnished, North 70' of description in Title Policy." In doing so, we reviewed the authorities on this subject, including other cases in which the words "my" or "his" were not used and said (at p 1298):

> "The fact that the property was not properly described in the writing does not necessarily mean that as between the parties the contract was unenforceable. In deciding disputes between the parties to a land sale contract, courts, including this one, have often held that evidence showing that *both parties clearly understood what land was intended,* or that the seller had put the purchaser into possession of a particular tract, would cure uncertainties in the contract description of the land." (Emphasis added).

In this case Mrs. O'Callaghan, one of the defendants, expressly admitted on cross-examination

that "there was no question in (her) mind as to what property it referred to." This testimony was uncontradicted, since her husband, Mr. O'Callaghan, the other defendant, did not testify, and plaintiff testified to the same effect.

Moreover, where, as in this case, there was only one parcel of approximately two acres located directly north of and contiguous to a definitely specified location, we see nothing more indefinite in this description than in descriptions conceded by defendants to be sufficient in which property was described as "my 15 acre farm located one mile north of Woodburn, Marion County, Oregon," and as "his 5 acre residence property lying west of the Catholic Church" (*Bogard v. Barhan*, 52 Or 121, 96 P 673 (1908)). The primary significance of the reference to "my" or "his" farm or residence in these cases was to exclude the possibility of more than one farm or residence north or west of a definitely specified location. In this case it is just as clear that there was *only one* parcel of approximately two acres directly north of and contiguous to the definitely specified location.

Accordingly, we hold that the agreement in this case set forth a sufficiently definite description of the tract of land subject to the agreement to satisfy the requirements of the statute of frauds, as previously construed by this court. See also 4 Tiffany, Real Property (3d ed) 114-117, § 997; 6 Thompson on Real Property (1962 Replacement) 446-450, § 3022; 6 Powell on Real Property 200-204, § 888, and Note, 25 Or L Rev 192 (1946).

3. We have also considered defendant's final contention that the real estate broker, Mr. Harris, did not have authority to act as agent on behalf of defendants

to sell the property involved and to receive the proceeds (although that contention was not presented by proper assignment of error). In this case, however, the agreement was in writing and was personally signed by both parties. (See ORS 41.580 (6) and *Johnson v. Davis,* 252 Or 472, 475, 450 P2d 758 (1969)). In addition, we find, after examining the entire record, that there was ample evidence to establish that Mr. Harris had such authority. See *Cascade Warehouse Co., Inc. v. Dyer,* 256 Or 377, 474 P2d 325 (1970).

For all of these reasons, the decree of the trial court is affirmed.

Affirmed.