Argued October 7, affirmed November 29, 1974

WALL ET AL, *Respondents, v.*
S.E.C. CO., INC., *Appellant.*
528 P2d 1054

554

*William L. Sisemore,* Klamath Falls, argued the cause for appellant. With him on the briefs was William Ganong, Jr., of Ganong & Sisemore, Klamath Falls.

*Robert Thomas,* Klamath Falls, argued the cause for respondents. With him on the brief was Sam A. McKeen, Klamath Falls.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, TONGUE, HOWELL, SLOPER and LEAVY, Justices.

TONGUE, J.

This is an action by a tenant against a landlord for damages for breach of a lease agreement. The case was tried before a jury, which returned a verdict in favor of plaintiff in the sum of $14,113 general damages and $6,250 special damages. Defendant appeals from the resulting judgment. We affirm.

*Summary of the facts.*

1. *Execution of lease—attached "stipulations."*

Klamath Forest Estates is a real estate subdivision in Klamath County and was being developed by defendant. Defendant advertised in Southern California for the sale of tracts in Klamath Forest Estates and had its sales office near Los Angeles. As part of its plan to develop that area defendant constructed a building on one of its lots for operation as a store.

Plaintiffs had been engaged in the operation of a small business near Los Angeles and were attracted by defendant's advertising. They bought 10 acres "sight unseen" and then visited the Klamath Forest Estates. During that visit they later inquired about the possibility of leasing defendant's building for operation as a store.

After some delay, during which plaintiffs sold their business and moved to Oregon, they met with Tom White, defendant's manager of the tract, to execute the lease. According to plaintiffs, they had been told by a Mr. Adams, defendant's sales manager in Los Angeles, that "what Tom White says goes." White was also referred to as the tract manager of Klamath Forest Estates area in defendant's advertising publications.

Plaintiffs testified that Mr. White presented them with a proposed written lease, which they examined, and that they then told him that they wanted it "stipulated" that as part of the lease agreement the driveway would be "cindered" and "kept free of snow," so that the "delivery people" could get in, and that there would be both a "water hook-up" and "a septic tank hook-up."

Plaintiffs also testified that Mr. White "wrote down" these "stipulations" on a separate sheet of paper, which was then signed by him, as well as by both plaintiffs, and then attached to the lease. The lease with these "stipulations" attached was then also signed by the plaintiffs and mailed to defendant's Los Angeles office. According to plaintiff Wall, they were told by Mr. White that these "stipulations" would be "typed in at the California office" and that "when it came back it would have these stipulations in it."

The written lease was subsequently signed on behalf of defendant by a Mr. Arthur W. Carlsberg. It did not then, however, "have the attachments [on] it" and defendant's witnesses testified that when it was previously received by its Los Angeles office it had no such "attachments." After the return of the lease, the date was changed from October 1 to November 1, 1966, by Tom White and he then "initialed" that change.

According to plaintiff Wall, plaintiffs asked Mr. White "many times about those stipulations"; that "he kept telling me * * * that everything promised would be done"; that she was never given any reason to believe to the contrary; that she would not have "entered into this business without those stipulations";

and that in reliance upon them plaintiffs "spent a lot of money stocking that store and put a lot of work in." Other testimony was also offered by plaintiffs of their many complaints and of the promises by Tom White and by his successors as "tract manager" that these things would be "taken care of."

Plaintiffs also offered evidence that at a meeting with Mr. Richard Carlsberg in August 1968 the water "hook-up" and the sewer "hook-up" were discussed and that Mr. Carlsberg then said that he thought that these matters "had been taken care of."

The original lease was for a term of one year, with an option to renew for a term of five years. That option was exercised by the plaintiffs. According to plaintiffs, however, they did not do so until after they were assured by Tom White and others that these matters would be taken care of. The lease, as renewed, expired by its terms on November 1, 1972.

2. *Operation of store—difficulties with driveway, water and septic tank "hook-ups."*

Plaintiffs began operation of the store on November 15, 1966. They offered evidence to show that the business grew steadily, as shown by its monthly gross sales, until August 1968, after which the business steadily declined.

In 1968 a lot adjacent to the store was sold and it was then discovered that a portion of the driveway to the store passed over this lot. In August 1968 the purchaser of that lot "closed off" the driveway for a week. Defendant then put in a new driveway to the store, but apparently it was steep and narrow and was not surfaced with either cinders or gravel. There

was also evidence that this new driveway had "boulders" and "stumps" in it and became "rutted." As a result, according to plaintiffs' testimony, delivery trucks "couldn't get up," and there was no place for them to park "below." It also appears that customers' cars had considerable difficulty with the new driveway during the winter of 1968-69 beginning with rain in August and September, which caused the new driveway to become so slick and muddy as to become impassable.

Meanwhile, according to further testimony offered by the plaintiffs, no water or sewer "hook-up" had been made and the well from which plaintiffs hauled their water had become polluted by a septic tank. In October 1968 the health authorities notified plaintiffs that they must either close the store or secure a water supply "of a safe and sanitary quality."

According to testimony offered by the plaintiffs, defendant ignored further complaints and put a lock on the pumphouse door in February 1969 after which plaintiffs closed down the store and moved out at the end of that month. Plaintiff Fitzgerald testified that:

> "A. Well, the water well had been completely shut up, nobody could get in or out and our business had dropped off so until it wasn't paying us to keep open, to even keep a heater running to keep the produce from freezing and I saw no future at that rate keeping it open."

■ Much of the testimony offered by plaintiffs was denied by defendant. Because of the verdict by the jury in favor of the plaintiffs, however, the testimony offered by them must be accepted as true for the purposes of this appeal. *Krause v. Eugene Dodge, Inc.*, 265 Or 486, 490, 509 P2d 1199 (1973).

*Defendant's motions for a nonsuit and directed verdict were properly denied.*

1. *Plaintiffs' evidence relating to the "stipulations" attached to the lease did not violate the parol evidence rule or the statute of frauds.*

■ Defendant assigns as error the denial of its motions for nonsuit and directed verdict and in support of that assignment contends that plaintiffs' testimony relating to the agreed "stipulations" which were attached to the written lease at the time that it was signed by the plaintiffs "violated the parol evidence rule."[①]

■ According to testimony offered by the plaintiffs, these oral "stipulations" were "reduced to writing," signed by them and by Mr. White, as a representative of defendant, and attached to the lease prior to plaintiffs' signing of the lease. As such, these "stipulations" were part of the written agreement between the parties at that time. Even if the sheet of paper with these "stipulations" was later detached, so as not to be a part of the written lease agreement when it was signed by Mr. Carlsberg, the offer of such testimony does not violate the parol evidence rule. This is so not only because, for the purposes of ORS 41.740, according to that testimony, "the terms of [the] agreement [had] been reduced to writing," but also because most, if not all, of the subject matter of the "stipulations" did not contradict the terms of the

---

[①] Plaintiffs contend that defendant cannot raise this question on a motion for a nonsuit or a directed verdict because defendant did not object to plaintiffs' evidence at the time it was introduced. Because, however, the parol evidence rule is a rule of substantive law defendant was entitled to raise the question by such motions. See Ruff v. Boltz, 252 Or 236, 239, 448 P2d 549 (1969).

lease and were admissible as "collateral agreements," even if not reduced to writing. See *Thorne v. Edwards,* 147 Or 443, 454-55, 34 P2d 640 (1934).② Whether or not plaintiffs' testimony was true was a question for the jury.

■ In support of the same assignment of error defendant also contends that the statute of frauds was violated because the written lease made no reference to any of the "stipulations" claimed by plaintiffs. Again, however, according to plaintiffs' testimony, there was a separate sheet of paper setting forth these "stipulations," signed by or on behalf of both parties, and attached to the formal lease so as to become a part of it when it was also signed by the plaintiffs. Whether or not Mr. White had authority to sign that agreement is a separate problem, as discussed below. In addition, the evidence offered by plaintiffs of the part performance by them of their obligations under the lease agreement (which included these "stipulations," according to their testimony), as well as the evidence of plaintiffs' reliance upon the terms of these "stipulations," in support of the allegations of estoppel in plaintiffs' complaint, was sufficient in our opinion to take this case out of the requirements of the Statute of Frauds. See *Stevens v. Good Samaritan Hosp.,* 264 Or 200, 504 P2d 749 (1972); and *Howland v. Iron Fireman Mfg. Co.,* 188 Or 230, 317, 321, 213 P2d 177, 215 P2d 380 (1949). See also, 2 Corbin on Contracts 464, § 425 (1950). Again, whether or not

---

② The only possible exception was the "stipulation" that defendant would provide a "water hook-up." We do not believe, however, that this was inconsistent with the provision of the lease to the effect that utility *charges,* including water, would be paid by the lessee. Plaintiffs do not claim an agreement under which defendant was to pay for the water, but only that defendant was to provide a "water hook-up."

plaintiffs' evidence was true was a question for the jury.

■ Defendant also contends that there can be no subsequent modification of the terms of a written contract unless the subsequent modification is also in writing and is supported by some separate consideration. Defendant says there was neither good consideration nor part performance because plaintiffs did nothing not already required by the terms of the "original lease." According to plaintiffs' testimony, however, this is not a case of the subsequent modification of a written agreement, because there was no agreement at all until the "stipulations" were agreed upon, reduced to writing, signed by them and attached to the lease agreement. Because the jury could find, based upon that testimony, that these "stipulations" were included as parts of the original agreement, it follows that no separate consideration was required for these "stipulations" and plaintiffs' "part performance" was of the entire lease agreement, including these "stipulations."

2. *There was sufficient evidence to support a finding by the jury that Mr. White had at least apparent authority to agree to the "stipulations" on behalf of defendant.*

Defendant contends that Mr. White had no actual authority to agree upon these "stipulations" and that plaintiffs cannot rely upon any apparent authority that he may have had because they knew that he did not have actual authority, citing *Lumbermen's Mut. Cas. v. Jamieson,* 251 Or 608, 615, 447 P2d 384 (1968).

In support of that contention defendant says that

as a "tract manager Mr. White did not have authority to make lease agreements"; that the leasing of the store building was "outside of the ordinary business of land sales engaged in by defendant"; that plaintiffs knew that after the lease was signed by them it had to be sent to defendant's office in Los Angeles for approval and signature; and that they later wrote a letter acknowledging that neither White nor the other tract managers "had authority to make promises regarding their lease."

Plaintiffs, however, offered considerable testimony to support their contention that Mr. White, as the tract manager, had at least apparent authority to make promises regarding that lease, including the "stipulations" which were written down by Mr. White and signed by him, and on which they relied to their detriment. This evidence included publications prepared by defendant referring to Mr. White as the "tract manager"; testimony that plaintiffs were told by defendant's sales manager in its Los Angeles office that "whatever Tom White says goes"; that the succeeding tract manager also promised to perform the "stipulations" agreed upon by Mr. White; and that even Mr. Richard Carlsberg, in a subsequent conference with plaintiffs at which they repeated their complaints that these promises had not been performed, said that he thought that "these matters had been taken care of."

■ The jury could properly have found from this and other evidence that Mr. White had at least apparent authority to agree upon the "stipulations" which he wrote down and signed, according to plaintiffs' testimony. The jury could have made such a finding— even though plaintiffs knew that the lease, with the

attached "stipulations," was to be mailed to Los Angeles—in view of plaintiffs' further testimony that they were told by Mr. White that "when it came back it would have those stipulations in it." See *Cascade Warehouse v. Dyer,* 256 Or 377, 381-82, 471 P2d 775, 474 P2d 325 (1970), and *Howland v. Iron Fireman Mfg. Co., supra* at 257.

As for plaintiffs' subsequent letter, the jury could have found that its language, as explained by plaintiff Fitzgerald and when viewed in the context of the circumstances at that time, was at most ambiguous and did not constitute an admission that Mr. White had no such authority.[9]

■ After reviewing the record, we hold that there was sufficient evidence to make a jury question whether Mr. White had apparent authority to agree upon the "stipulations" and whether plaintiffs relied upon such apparent authority and did not know that he had no such actual authority.[10]

---

[9] That letter, date stamped March 3, 1969, included the following statement:

"The foregoing requests and suggestions are repetitions of things that were verbal agreements with one of your company representative[s]. Now it seems as if these very things are being denied. The fault is as much our responsibility as anyone other person. We allowed the proper communication with the right parties to fall short. * * *" (Signed by both plaintiffs.)

[10] Under the heading "lack of authority" defendant also contends that the Statute of Frauds, ORS 41.580 (6), requires that an agreement concerning real property made by an agent is invalid "unless the authority of the agent is in writing." From our examination of the cases, it would appear that ORS 41.580 (6) was intended to apply primarily to sales or leases of property by independent real estate agents or brokers, rather than to sales or leases of property by a corporation, acting through its own employees. Compare *Kallstrom v. O'Callaghan,* 259 Or 210, 226-27, 485 P2d 1200 (1971); *Johnson v. Davis,* 252 Or

3. *There was sufficient evidence to submit to the jury the question whether plaintiffs had been damaged.*

Plaintiffs' complaint alleged the following damages: (1) loss of future profits of $9,500; (2) loss of compensation in the sum of $30,263; and (3) loss of good will in the sum of $25,000. The trial court withdrew the claim of loss of future profits, but submitted to the jury the remaining two claims.

In support of defendant's assignment of error arising from the denial of its motions for a nonsuit and a directed verdict defendant contends that although plaintiffs' claim for loss of future profits was withdrawn from the jury, the trial court erred in submitting to the jury plaintiffs' claim for loss of compensation because:

"* * * Whether this money is called compensation or profits in essence it amounts to the same thing because the store would have had to make a profit before it could have paid compensation to the plaintiffs for their services. * * *"

Defendant also contends that:

"The plaintiffs failed to prove that their business had a history of profitable operations and, therefore, could not show with a reasonable degree of certainty any lost future profits;

"The plaintiffs failed to prove with reasonable certainty that their business had the necessary ingredients of good will."

As authority to support these contentions defendant relies primarily upon our decision in *Buck v.*

472, 474-75, 450 P2d 758 (1969); *Hage et ux v. Harvey et al*, 210 Or 652, 656-57, 313 P2d 448 (1957); *Kneeland v. Shroyer*, 214 Or 67, 89, 328 P2d 753 (1958). In any event, part performance, of which there was evidence in this case, also provides a defense to any such contention.

*Mueller,* 221 Or 271, 282-83, 351 P2d 61 (1960), in which we said:

> "* * * Plaintiff's proof of loss must meet the test of 'reasonable certainty,' * * * the loss of profits must not be uncertain and speculative. * * * Past profits may be shown if they reflect the operation of an established business. [Citing cases] If the business has not operated long enough to establish a reliable record of profits, the jury will not be permitted to speculate upon the probable success of the particular business alleged to have been harmed. [Citing cases]"

Defendant also cites our subsequent decisions to the same general effect and says that plaintiffs' grocery store had been in business for only two years and "had not established a reliable record of profits," as demonstrated by the fact that plaintiffs' net income for 1967 was $2,095.14, and for the year 1968 it suffered a loss of $2,676.40 (not including $1,200 in unreported accounts receivable at the end of 1968), and that these figures did not consider the value of plaintiffs' services. Defendant also contends that the testimony of plaintiffs' expert witness, based upon a projection of the increase in monthly income prior to August 1968, was "nothing more than speculation without any rational basis or supporting data." In addition, defendant says that each of the plaintiffs admitted that she earned more in 1969, 1970, 1971 and 1972 from work as a waitress, planting trees in a nursery, cutting wood, and other work, than she had made during 1967 and 1968. Defendant also contends that plaintiffs made more money from such work than they would have made if they had continued to operate the store during those years.

In response to these contentions, plaintiffs do not contend on this appeal that in such a case a plaintiff

is entitled to recover for loss of compensation as an item of damages separate and distinct from a claim for loss of profits. Thus, we need not decide that question. Plaintiffs do contend, however, that there was sufficient evidence in this case to make it proper for the trial court to submit to the jury the question whether plaintiffs suffered a loss of profits. Thus, in effect, plaintiffs' contention is that they suffered a loss of profits in an amount which would have been sufficient to enable them to pay themselves compensation for their services to the business.

█ Based upon our review of the record in this case, we have concluded that there was sufficient evidence to support a finding by the jury that plaintiffs suffered a loss of profits in an amount which would have been more than sufficient to have enabled them to pay themselves some reasonable compensation for their services during the remaining years of this lease.

As stated in *Verrett v. Leagjeld,* 263 Or 112, 115, 501 P2d 780 (1972):

"* * * It is apparent from reading our cases that the essential ingredient of proof of lost profits to a reasonable certainty is supporting data. Where there has been supporting data we have approved the recovery of lost profits. *Sachs v. Precision Products,* supra; *Furrer v. Int'l Health Assurance,* 256 Or 429, 474 P2d 759 (1970); *Preble v. Hanna,* 117 Or 306, 244 P 75 (1926). See, also, *Smith v. Abel,* 211 Or 571, 316 P2d 793 (1957) (distinguished on this ground in *Douglas Const. v. Mazama Timber,* 256 Or 107, 471 P2d 768 (1970). Where supporting data was lacking we have denied recovery. *Pearson v. Schmitt,* 259 Or 439, 487 P2d 84, modified 260 Or 607, 492 P2d 269 (1971); *Douglas Const. v. Mazama Timber,* supra; *Randles v. Nickum & Kelly S. & G. Co.,* 169 Or

284, 127 P2d 347 (1942); *Solomon v. Kenner,* 121 Or 407, 255 P 471 (1927); *Hagestrom v. Sweeney,* 60 Or 433, 119 P 725 (1912). See, also, *Brenneman v. Auto-Teria, Inc.,* 260 Or 513, 491 P2d 992 (1971)."

In this case the primary "supporting data" relied upon by plaintiffs as the basis for a projection of future profits was a record of increasing monthly gross sales up to the month of August 1968, when, according to their testimony, the original driveway to the store was cut off and suppliers and customers were unable to gain access by the new driveway installed by defendant. That record was as follows:

Monthly Recap of Gross Sales

| | 1967 | 1968 | 1969 |
|---|---|---|---|
| January | 362.74 | 980.57 | 584.88 |
| February | 314.75 | 1,029.52 | 571.16 |
| March | 433.10 | 1,216.21 | Closed |
| April | 751.50 | 1,835.83 | |
| May | 1,123.89 | 1,976.90 | |
| June | 1,831.36 | 2,096.06 | |
| July | 2,354.71 | 2,882.80 | |
| August | 2,205.03 | 2,703.23 | |
| September | 1,758.06 | 1,942.23 | |
| October | 1,757.03 | 1,661.33 | |
| November | 1,610.16 | 1,191.83 | |
| December | 1,223.35 | 643.81 | |

Plaintiffs also offered evidence that when they first visited Klamath Forest Estates there were only 35 people there; that in 1968 there were 208 people and in 1972, when the lease would have expired, there were 350; that there was no other store within nine miles; that they had acquired a good and friendly relationship with people in the area; and that they

had also developed customers from the adjacent area and from travelers on the adjacent highway between Klamath Falls and Lakeview, including substantial business from the sale of beer.

Based upon these facts, plaintiffs' expert witness, a C.P.A., computed a projection of future monthly income, from which he expressed the opinion that plaintiffs would have earned profits in the sum of $32,358 over the term of the lease.

In our judgment, the foregoing evidence included sufficient "supporting data" so as to make it proper to submit to the jury plaintiffs' claim of damages for loss of profits, including the question whether plaintiffs would have made profits in an amount more than sufficient to pay themselves some reasonable compensation for their services. Although that claim was not submitted to the jury as a claim for loss of profits, it nevertheless follows that because there was thus sufficient evidence that plaintiffs had suffered such damages, the trial court did not err in denying defendant's motions for a nonsuit and a directed verdict. Those motions went only to the sufficiency of the evidence to support recovery of any damages by plaintiffs.

It also follows, in our judgment, that the trial judge did not err in submitting to the jury plaintiffs' claim for lost compensation under the circumstances of this case. As previously stated that claim was, in effect, a claim that plaintiffs suffered a loss of profits in an amount sufficient to enable them to pay themselves some compensation for their services to the business. Defendant does not raise by any proper assignment of error the question whether this is the

proper measure of damages in this case or whether, in such a case, a plaintiff may demand damages for lost compensation, as such. Cf. *Buck v. Mueller, supra.* Defendant also made no motion to withdraw from the jury plaintiffs' claim for loss of compensation. Accordingly, we do not decide that question in this case.

Moreover, this case was submitted to the jury under an instruction requested by the defendant on that subject to the effect that before plaintiffs could recover for loss of compensation they must prove to a reasonable certainty that their grocery store would have been able to pay them for their services and that the jury was to deduct any wages that they earned in other employment during the term of the lease. Also, in response to a motion by defendant to reduce the amount of plaintiffs' claim for lost compensation to "what the outside evidence was," the trial court reduced the amount of that claim to $30,263.

Under these circumstances, defendant cannot properly contend under its assignment of error relating to the denial of a nonsuit and directed verdict that the court erred in submitting to the jury plaintiffs' claim for loss of compensation.

In support of defendant's assignments of error for denial of its motions for a nonsuit and a directed verdict defendant also contends, as previously noted, that "the plaintiffs failed to prove with reasonable certainty that their business had the necessary ingredients of good will." Defendant also contends that because of the five-year lease, this business could not have any good will for which compensation could be claimed.

We need not decide those questions in this case,

however, because plaintiffs offered sufficient evidence to go to the jury in support of their claim for damages for lost compensation. It follows that there was no error in denying defendant's motions for a nonsuit and a directed verdict regardless of whether or not plaintiffs offered sufficient evidence to also entitle them to recover for loss of good will. It is true that defendant moved to withdraw from the jury plaintiffs' claim for loss of good will, but no error is assigned by defendant for the denial of that motion and the only error assigned is for the denial of its motions for a nonsuit and a directed verdict. Those motions, which go to the sufficiency of plaintiffs' evidence to support a recovery of damages of any kind, were properly denied.

*The trial court did not err in its rulings on evidence or instructions.*

1. *Projection of future profits.*

Defendant assigns as error the overruling of its objection to the testimony of plaintiffs' expert witness consisting of a computation of future profits in the sum of $32,358. Defendant objected on the ground that there was no evidence that plaintiffs' business was an "established business with a reliable record of past profits," citing *Buck v. Mueller, supra.* For reasons previously stated, there was sufficient "supporting data" for such testimony and it was not error to overrule defendant's objection.

2. *Qualifications of expert witness.*

Defendant assigns as error the overruling of its objection to the qualifications of plaintiffs' other expert witness, an experienced grocer, who testified to the amount of a reasonable wage for each of the

plaintiffs as operators of a two-person grocery store during the years in question and also to the value of the good will of plaintiffs' grocery store business. Defendant objected on the ground that the witness was not familiar with plaintiffs' particular operation. Defendant also contends that "his stores were all located in metropolitan areas," rather than in a "remote area," as in this case. Defendant did not object, however, on the ground that testimony on this subject was not relevant.

 The witness had been engaged in the grocery business for 35 years, including operation of small grocery stores in Ashland, Jacksonville, Central Point and a "man and wife" grocery in Klamath Falls from 1969 to 1972. The qualifications of an expert witness are ordinarily a matter within the discretion of the trial court. *Denny v. Warren,* 239 Or 401, 408, 398 P2d 123 (1964). We think that there was no abuse of that discretion in this case. The fact that this witness was not familiar with this particular store and the fact that the grocery stores operated by him had not been in "remote areas" did not disqualify him as a witness, as a matter of law, although they were facts which went to the weight of his testimony.[9]

3. *Exclusion of testimony of subsequent operator of store in same building.*

Defendant assigns as error the exclusion of testimony by an operator of a store in the same building after it was vacated by plaintiffs. Defendant offered to prove by that witness that the store operated at a loss during the period from November 1969 to June

---

[9] Defendant also contends that plaintiffs' expert witness did not state the basis for his opinion. That, however, was not the ground for defendant's objection at the time of trial.

1970. It appears, however, that during that period the store did not have a beer license and did not stock either meat, "fresh produce" or clothing, among other differences in operation. It also appeared that the driveway was still "difficult in the winter months to get into."

■ The testimony of the operation of a store in the same building at a loss by that witness may have had some probative value, but any such probative value was slight and various collateral issues would have been raised by such testimony. Under such circumstances it was not error to exclude such testimony. See McCormick on Evidence 437-39, § 185 (2d ed 1972).⑥

4. *Failure of court to instruct on proper measure of general damages.*

Defendant's final assignment of error is that the trial court erred in failing to give its requested instruction on the proper measure of general damages in such a case.⑦

---

⑥ Defendant also assigns as error the sustaining of plaintiffs' objections to questions asked of one of defendant's witnesses. No offer of proof was made by defendant to show what the witness would have said if permitted to answer the questions. Defendant says that no offer of proof was required in order for this court to determine whether or not it was error to sustain that objection. We disagree, based upon our examination of the record. Cf. Walter v. Echanis, 163 Or 148, 155, 95 P2d 979 (1939).

⑦ Defendant's requested instruction was as follows:

"If you find that plaintiffs are entitled to damages you will first determine the amount of general damages that they have sustained as a result of the acts of the defendant.

"The standard measure of general damages for the loss or deprivation of the plaintiffs' leasehold interests is the difference between the reasonable rental value of the premises which the plaintiffs have alleged is $144.00 per month, and

The court gave no instructions on general damages. As previously stated, however, the damages requested by plaintiffs and submitted to the jury were for: (1) loss of compensation and (2) loss of good will, which are ordinarily considered to be special damages in such a case. In *Buck v. Mueller, supra,* we said (at 281) that:

"\* \* \* The special damages flowing from defendant's conduct would also be measured exactly the same whether that conduct is viewed as a tort or a breach of contract—the damage is the loss of profits and any other losses incident to the dispossession of plaintiff. Denominating defendant's conduct as a breach of contract does not give the plaintiff a license to demand damages not subject to measurement.

"Although there are no general damages in the instant case, plaintiff is entitled to recover special damages for the invasion of his interest in the leasehold, if he can prove such damages. He may show that as a result of a deprivation of possession he suffered a loss of business profits. \* \* \*"

Defendant says, however, that it was prejudiced because the form of verdict submitted to the jury had both a "blank" for general damages and a "blank" for special damages and was filled in so as to award $14,113 general damages and $6,250 special damages. Defendant also says that "the jury could only assume that a blank on the form was to be filled in with damages for lost compensation and the other was to be filled in with damages for the lost good will."

---

the reserved rent which in this case is $144.00 per month, therefore, there being no difference between the rental value and the rental agreed upon, the plaintiffs can show no general damages."

■ There may be a question whether the verdict was a proper verdict. Because, however, there is no record of any objection by defendant to that verdict and because defendant has made no such assignment of error in its brief, that question is not properly before this court on this appeal.

Holding, as we do, that there is no merit to defendant's assignments of error, the judgment of the trial court is affirmed.