Argued at Pendleton May 8, affirmed October 16, 1928.

# THE DESCHUTES COMPANY *v.* E. M. LARA ET AL.

(270 Pac. 913.)

For appellant there was a brief and oral argument by *Mr. Ross Farnham.*

For respondent there was a brief and oral argument by *Mr. Jay H. Upton.*

ROSSMAN, J.—The pleadings are lengthy and intricate; a better understanding of the problems presented to us for our solution may be gained by a review of the evidence. Prior to 1922 the First National Bank of Bend had made some loans to the then owner of the property involved in this suit. When payment was not forthcoming the president of the bank, Mr. C. S. Hudson, and the defendant, E. M. Lara, who was the cashier, effected an arrangement

whereby they became the obligors of that debt and the owners of this property. In 1917 Mr. Lara left the employ of the bank; at that time Mr. Hudson acquired his interest in this property and assumed the entire debt. During all of this period of time the loan appeared upon the books of the bank as the Oregon Street Building Account; in 1922 it amounted to $5,880. A deed to the property in question, in which one of the directors of the bank was named grantee, secured the loan. Mr. Hudson became indebted to the bank upon other loans, and by 1922 his financial affairs had become such that the Federal Bank Examiner found the loans to him were excessive. His report to the Comptroller of Currency recommended that an improvement should be required of the condition of these loans. Mr. Hudson and Mr. DeArmond, attorney for the bank, testified that in order to place the Oregon Street Building Account in a better condition they conceived the idea of the formation of a corporation to be known as the Deschutes Company. Their plan contemplated that Mr. Hudson should convey to it the property in question, and that the corporation should execute its notes in the amount of the Oregon Street Building Account, bearing Mr. Hudson's indorsement. They also proposed that this note should be secured by a pledge of all the capital stock of the corporation and a deed to the property. A feature of this proposition, which was very attractive to Mr. Hudson, was the fact that he believed that this arrangement would protect the bank as fully as if the note was secured by a mortgage. He apparently desired to avoid the necessity of the latter act. Pursuant to this plan, April 28, 1922, articles for the incorporation of the

Deschutes Company were filed with the corporation commissioner and on that date a certificate of incorporation was issued. About that time the bank examiner, who had been insistent upon an improvement of the Oregon Street Building Account, was replaced by an examiner who displayed a more indulgent attitude toward the loan, with the result that the incorporators halted their efforts toward the consummation of the foregoing plan. The license fees exacted by the state for the years 1923 and 1924 were not paid, and the company neglected to furnish the corporation commissioner with the annual statements required by the session laws for the above two years This delinquency was reported by the corporation commission to the Governor, and resulted in the issuance of a proclamation by the latter, January 6, 1925, declaring the corporation dissolved and its articles of incorporation revoked. February 1, 1924 the incorporators opened books for subscription to the capital stock of the Deschutes Company; three individuals, DeArmond, Bennett and Downing, subscribed for the fifty shares, which constituted its total, authorized capital stock. On the same day all of the routine matters were done which were essential to the completion of the incorporation of the company, including the adoption of by-laws, the selection of directors, the holding of a meeting of the latter and an election of officers. While the minutes of the corporation do not contain the information, the testimony shows that Mr. Hudson made the corporation a proposition that he and Mrs. Hudson would pay the corporation for its total issue of capital stock by executing to it a deed for the property in question and that it should give the bank its note for the

amount of the Oregon Street Building Account; this proposition the corporation accepted. February 2, 1924, the stockholders held another meeting, as is shown by the minutes. Mr. Hudson appears as the holder of forty-eight shares while Mrs. Hudson and DeArmond each held one share. The three were elected directors. On the same day the directors held a meeting, and elected Hudson president and Mr. DeArmond secretary. February 4, 1924, Mr. and Mrs. Hudson executed their warranty deed to the property in question. The grantee's name appears as the Deschutes Company; the deed was not recorded, but was deposited with Mr. DeArmond, secretary of the corporation, who was also a director of the bank, with instructions to hold it as collateral security for the corporation's debt to the bank. The books of the bank reveal that on February 1, 1924, there appears upon its accounts for the first time the name of the Deschutes Company; this entry shows the latter company indebted to the bank in the amount of $5,580 upon a note, and that the note was indorsed by Mr. Hudson. This indebtedness was never extinguished except by the process of giving new notes when the old ones became due. The old loan, together with some additional ones, and the accumulation of interest, increased to the extent that on April 8, 1926, when the company signed its last note, the amount aggregated $10,031. In the meantime the bank held the fifty shares of stock of the company as collateral security, and Mr. DeArmond retained the deed to the real property. Among the possessions of the bank was a customer's financial statement dated April 5, 1926, signed by the Deschutes Company, showing its property to be worth

$60,000, and its indebtedness, including the note to the bank, amounted to $38,680; its only property was that in question. The Deschutes Company continued its account with the bank until the failure of the latter; during this period of time it made many deposits and issued approximately one hundred checks. While the last minutes of the corporation are dated February 2, 1924, both Mr. DeArmond and Mr. Hudson testified that after that time other meetings of the directors and stockholders occurred. Mr. DeArmond testified that he was ignorant of the Governor's proclamation, which revoked the corporation's franchise. Mr. Hudson testified to like effect although his answers upon cross-examination are not entirely satisfactory. The property produced a rental of approximately $10,000 a year, which was deposited to the credit of the company and withdrawn by checks bearing its signature. April 25, 1927, or thereabout the bank became insolvent; a temporary receiver was appointed, and on May 10, 1927, Mr. H. T. Schilling, who filed the complaint in intervention, became the permanent receiver. In order to collect upon the note bearing the signature of the Deschutes Company and ultimately wind up its affairs, and convert its assets into cash for the payment of the obligations due the bank, Mr. Schilling commenced a suit against the Deschutes Company, the Hudsons and Mr. DeArmond; the decree was in his favor. September 26, 1927, upon a sale by the sheriff, Schilling, his attorney, and his assistant, acquired the fifty shares of capital stock, all for the benefit of the receiver. As a result of this transaction the debt due from the company to the bank was credited with the sum of $4,520, the amount bid for the stock. Upon acquiring the

foregoing stock, the three elected themselves directors and officers; they then discovered the fact that January 6, 1925, the Governor had dissolved the corporation. The delinquencies were at once defrayed and October 17, 1927, the corporation commissioner restored the company to all of its franchises and privileges and entitled it to resume its business.

The defendant, Lara, became interested in this property through the following circumstances: The Hudsons were indebted to him in a substantial amount upon two promissory notes. May 7, 1927, he brought actions upon these obligations; in each action he procured the attachment of this property. September 9, 1927, he recovered judgments; each judgment ordered the sale of the attached property. The deed to the Deschutes Company was not recorded until April 25, 1927, the time when the receiver took charge of the affairs of the bank.

The defendant contends that when the Hudsons executed the deed, in which the Deschutes Company was named grantee, that company had no existence as a corporation, and hence could not accept the conveyance; that if it then existed its subsequent dissolution caused the title to pass to the Hudsons and thus rendered it available for the attachments in Lara's actions against the Hudsons; that the evidence does not warrant a finding that the deed to the Deschutes Company was ever actually delivered in contemplation of law, and finally the defendant contends that, since the note for $10,031 was executed upon April 8, 1926, it had its inception after the dissolution proclamation and before the restoration of the corporation; that, therefore, the note was void.

In order that we may more conveniently address ourselves to a consideration of the problems submitted to us, we shall segregate the foregoing narrative into three periods of time. The first of these will cover the time between the dates of April 28, 1922, to February 1, 1924. On the former date the certificate of incorporation was issued by the state; on the latter the incorporators met, subscribed for the stock and the stockholders elected directors.

Section 6874, Or. L., provides:

"Any corporation organized under this chapter which does not elect directors and commence the transaction of the business for which it was formed, within one year from the time of filing the articles of incorporation, shall thenceforth be divested of its corporate powers, and if such corporation shall, for any period of six months after the commencement of its business, neglect and cease to carry on the same, its corporate powers shall also cease."

██ The state instituted no proceedings to revoke the articles of incorporation for nonuser, and never decreed a forfeiture of the articles unless the statute was self-executing. It will be observed that the circumstances enumerated in the statute are required of the corporation as conditions subsequent as distinguished from conditions precedent. That is, the coming of the corporation into existence is not postponed until those events occur, but when a corporation is guilty of the neglects set forth in the statute, they operate as conditions subsequent and divest it of its corporate powers. But, the question remains, do these delinquencies, by virtue of the statute, operate automatically, and forfeit the corporation's life; or, is it necessary that a decree of a court should pro-

nounce the forfeiture. In *People* v. *Los Angeles Electric Ry. Co.,* 91 Cal. 338 (27 Pac. 673), the court remarked: "Acts sufficient to cause a forfeiture do not *per se* produce a forfeiture. The corporation continues to exist until the sovereignty which created it shall, by proper proceedings in a proper court, procure an adjudication of forfeiture, and enforce it." However, if this statute expresses both the grounds of a forfeiture, and also a legislative intent, that upon the occurrence of those events the corporation's life should be forfeited, the court could not fail to give effect to the statute. Our problem, therefore, reduces itself to one of statutory construction. It is unnecessary to cite authorities to buttress the statement that forfeitures are not favorites of the law. Generally the courts require a clear expression of the legislative intent before they construe a statute as providing for an automatic forfeiture: *New York & L. I. Bridge Co.* v. *Smith,* 148 N. Y. 540 (42 N. E. 1088); Fletcher, Cyclopedia Corp., § 5427. To forfeit without judicial proceedings the life of a corporation, which had not elected directors, and which had not commenced the transaction of business, may not be fraught with any dangerous possibilities; but if we adopt this construction, which is suggested by the defendant, the life of the other class of corporations embraced in the same paragraph will also be taken without judicial proceedings: that is, any corporation which "for a period of six months, after the commencement of its business neglects and ceases to carry on the same." Thus valuable property rights acquired during the period of activity might become jeopardized. Further, it will be observed, that if the statute produces its results, without judicial proceedings, no record

will appear anywhere of charters which have been forfeited, except in those few instances where a court in a collateral proceeding passes upon the matter. In the meantime, third parties, ignorant of the existence of facts which automatically produce a forfeiture, may deal with the associates presuming that they constitute a corporation. Fletcher, Cyclopedia Corp., Section 5427, reviews many authorities from the several jurisdictions which passed upon attempted automatic forfeitures of corporate franchises. The writer states his conclusion thus: "Ordinarily courts are reluctant to hold that acts which are ground for forfeiture of a charter have the effect *ipso facto* of terminating the life of the corporation, without any legislative act or judicial decree. In fact the tendency of nearly all the decisions is to construe the statute, even though on their face indicating a self-executing ground of forfeiture, as requiring a resort to the courts to effectuate the harsh remedy of forfeiture, unless the language used in the statute is so plain that it is impossible to say that the intention of the legislature was to the contrary. It has been said that the question always depends 'upon the special facts, the character of the corporation, and the legal construction to be given to the particular statute'; although the better rule seems to be that the question whether a forfeiture clause in a statute or charter is or is not self-executing depends wholly upon the language employed." To same effect see 14a C. J., Corporations, page 1092. In *Attorney General* v. *Superior & St. Croix R. Co.,* 93 Wis. 604 (67 N. W. 1138), the court in a carefully reasoned opinion, which reviews many of the authorities dealing with the subject matter of forfeiture for nonuser, con-

cluded that a statute which provided that, "whenever any corporation * * shall have suspended its ordinary and lawful business for one whole year, it shall be deemed to have surrendered the rights, privileges, and franchises granted or acquired under any law, and shall be adjudged to be dissolved," did not *ipso facto* dissolve a corporation which suspended business for the above period.

The federal Circuit Court for the District of Oregon in the early case of *Wallamet Falls C. & L. Co.* v. *Kittridge*, Fed. Cas. No. 17,105, carefully reviewed the authorities, and held that the corporate existence was not forfeited automatically under the aforementioned section of our laws when a corporation fails to carry on its business for a period of six months. The words of the statute are, "shall thenceforth be divested of its corporate powers"; if this means, that the forfeiture operates without judicial proceedings, and that the attack may be made collaterally, practically all individuals who are opposed by a corporation in a piece of litigation would find it to their interest to challenge the existence of the corporation. We conclude that the conditions subsequent set forth in the statute are available only after they have been judicially determined, and that hence they did not present a proper field for inquiry in this suit. We do not believe that *Commercial National Bank* v. *Gilinsky*, 142 Iowa, 178 (120 N. W. 476, 134 Am. St. Rep. 406), relied upon by the defendant, decides anything in opposition to the above conclusions.

█ Pursuant to the requirement of Section 6883, Or. L., it became the duty of the Deschutes Company to furnish the Secretary of State in June of 1922 the information required by the above section of our Corporation Code. In July of 1922 there became due the

license fee for the fiscal year of July 1, 1922, to July 1, 1923, as required by Section 6883, Or. L. In the corresponding months of 1923 similar statements were returnable and similar license fees were payable. It is agreed that the company was delinquent in all of these matters February 1, 1924; and the defendant uses this circumstance as a premise for an argument that, therefore, the articles of incorporation had been forfeited *ipso facto*. A similar contention was advanced in *Klamath Lumber Co.* v. *Bamber*, 74 Or. 293 (142 Pac. 359, 145 Pac. 650). This court held, however, that no forfeiture takes place until the same is proclaimed by the Governor. We are satisfied with this conclusion.

We come now to the period of time from February 1, 1924, to January 6, 1925. Since we have found that the state had not revoked the charter, the articles of incorporation were available to the associates February 1, 1924. On that and the following day the incorporators completed their organization; February 4th the corporation accepted the deed, later a bank account was opened, notes were executed, rent was collected and disbursed; in fact, we now have a valid corporation regularly transacting business; it is a corporation *de jure*.

January 16, 1925, the Governor of this state revoked the corporation's articles of incorporation because of its failure to pay the annual license fees and make the yearly reports required by Section 6883, Or. L. His authority is stated in Sections 6896 and 6897, Or. L.

Section 6896, above referred to, provides:

"On or before the first Monday in January in each year the secretary of state shall report to the gover-

nor a list of all corporations which for two years or more next preceding such report have failed, neglected, or refused to furnish any such statement or to pay any such license fee, and the governor shall forthwith issue his proclamation declaring such corporations dissolved and their articles of incorporation revoked and repealed.''

Section 6897, Or. L., provides in part as follows:

'' * * provided, however, that every such corporation so proclaimed to be dissolved shall continue to exist as a body corporate for a period of five years from the date of such proclamation for the purpose of enforcement against it and its assets of all rights of suit or action, but for no other purpose.''

Section 6900 provides:

''If any corporation heretofore or hereafter created, shall have been dissolved, or shall hereafter be dissolved in the manner herein provided for, the governor, by and with the advice of the attorney-general may at any time, upon payment by such corporation to the state treasurer of such sum as may be fixed and determined by the governor, * * reinstate such corporation and restore it to all its franchises and privileges, and upon such payment, as aforesaid, the secretary of state shall issue his certificate entitling such corporation to resume its said business and its franchises; * * ''

It is evident that January 6, 1925, the Deschutes Company ceased to exist as a *de jure* corporation, and that it did not resume its status as such until October 17, 1927. It was in this period of time, that is, on April 5, 1926, that it executed its last note for $10,031, which is particularly mentioned in the complaint of the receiver. The defendant argues that the necessary consequence of the Governor's proclamation was to take title out of the corporation and

vest it in Mr. Hudson, the owner of all the corporation's capital stock. As we approach the problems presented by these contentions we should bear in mind that the corporation secured title before the Governor's proclamation of January 6, 1925, and that its corporate status was later restored to it. In these important facts this case differs from *Klorfine* v. *Cole*, 121 Or. 76 (252 Pac. 708, 254 Pac. 200), which the defendant relies upon. In that case this court held that the limited capacity possessed by a dissolved corporation did not empower it to transact a piece of new business consisting of the acceptance of a deed and a conveyance. The facts now before us require an inquiry only as to whether a corporation during the period of revocation possesses capacity to serve as a repository of title and as obligor of a debt. Nothing contained in *Klorfine* v. *Cole*, justifies a conclusion that a corporation dissolved by proclamation is divested of title *eo instanti*. Upon the other hand Section 6875, Or. L., makes express provision that "all corporations that expire by limitation * * or are dissolved * * or are annulled by forfeiture * * continue to exist as bodies corporate for a period of five years thereafter for the purpose of prosecuting or defending actions, suits, or proceedings by or against them, settling their business, disposing of their property, and dividing their capital stock. * * In Fletcher's Cyclopedia Corp., Section 5633, we find: "Under a statute providing that corporations whose charters have expired or been annulled may continue to act for the purpose of winding up their affairs, a corporation whose charter has expired or been annulled is entitled to hold property until its affairs are closed up." In *Society Perun* v. *Cleveland,* 43 Ohio,

481 (3 N. E. 357), it appeared that previously the State of Ohio had successfully maintained a *quo warranto* suit against Society Perun; thus, it had been established that this body was not a *de jure* corporation. Prior to this decree Society Perun had executed many deeds and mortgages. In the case cited the court held that the adjudication to the effect that Society Perun was not a *de jure* corporation did not foreclose an inquiry into the question whether it could serve the purpose of a conduit of title. It concluded that the deeds and mortgages were valid despite the corporation's lack of existence *de jure*. In a note to this case in Warren's Cases on Corporations, page 638, Professor Warren suggests: "It is submitted that the courts should go far in denying collateral attack for the benefit of innocent third persons where the only question is whether the corporation by assumption may be a conduit of title." The annotations cite many authorities in harmony with the suggestion, including *Kelly* v. *People's Trans. Co.*, 3 Or. 189. To the same effect may be added *Leavengood* v. *McGee*, 50 Or. 233 (91 Pac. 453), and *Brown* v. *Webb*, 60 Or. 526 (120 Pac. 387, Ann. Cas. 1914A, 148); for a discussion and collection of citations, see Thompson on Corps. (3 ed.), § 2460 Following the proclamation by the Governor Mr. Hudson did not claim this property, nor has he claimed it since. In fact, it seems that he was ignorant of the dissolution of the corporation. At that time the corporation owed approximately $38,680, but no effort was made by anyone to wind up its affairs; upon the other hand, it conducted its business as before. We conclude that while it was powerless to transact any new business, it possessed capa-

city to serve as a repository of title and as obligor of the debt, and that when its corporate functions were revived October 17, 1927, this piece of property remained as one of its assets.

The purpose of the provision of our statute, which continues the life of the corporation for five years after its dissolution by the Governor's proclamation, seems to be to afford a simple and inexpensive means of winding up its affairs; it dispenses with the necessity of a receivership and affords an opportunity for a revival in such an instance as that now before us.

In support of our conclusions we cite Cook on Corporations (8 ed.), § 637; Thompson on Corporations (3 ed.), § 6530; and see, also, *I. J. Goldstein Co.* v. *Mitchell,* 14 Ohio App. 231. In Fletcher, Cyclopedia Corp., Section 5633, the writer states: ''Under a statute providing that corporations whose charters have expired or been annulled may continue to act for the purpose of winding up their affairs, a corporation whose charter has expired or been annulled is entitled to hold property until its affairs are closed up.'' This conclusion is not a departure from our holding in *Service Lumber Co.* v. *Sumpter,* 81 Or. 32 (149 Pac. 531, 152 Pac. 262, 158 Pac. 175), and *Smyth* v. *Kenwood Land Co.,* 97 Or. 19 (190 Pac. 962).

■ Whether the corporation possessed the capacity April 5, 1926, to execute the note for $10,031, we deem a matter of but little importance. This was not a new loan; that note did not arise out of a new transaction. The corporation found itself again unable to discharge its debt to the bank. The parties, therefore, resorted once more to the devise of preparing a new note in place of the old. This did not extinguish liability upon the surrendered note; hence.

if the defendant's argument should succeed in avoiding the corporation's liability upon the note of April 5, 1926, the old debt would still remain. Our conclusions are not out of harmony with *Ransome-Crummey Co.* v. *Superior Court,* 188 Cal. 393 (205 Pac. 446), relied upon by the defendant.

■ The defendant argues that the Deschutes Company failed to file a copy of its articles of incorporation in Deschutes County, which is designated as the principal place of business of the corporation. The answer alleges such a failure, and the reply denies the averment. No evidence was offered upon this issue, except a certified copy of the articles of incorporation were received in evidence. This piece of evidence established *prima facie* the legal existence of the corporation: Section 6857, Or. L. If the deficiency alleged by the defendant existed, the defendant should have offered evidence thereof.

Defendant also contends that the evidence fails to establish that Hudson unconditionally delivered the deed to the corporation. This is largely a question of fact; the decision of the lower court was in favor of the plaintiff upon this issue, and we find no occasion to depart therefrom. The facts in *In re Jackson Brick & Tile Co.,* 189 Fed. 636, are in many important particulars similar to those before us; the delivery was there held sufficient. We have carefully considered all other matters presented to us by the defendant; our conclusions are adverse to his argument.

It follows that the decree of the lower court should be affirmed. Costs will be allowed to neither party.

AFFIRMED.

RAND, C. J., and COSHOW and BEAN, JJ., concur.