Argued June 5, reversed and remanded September 12, 1978

HIGH et al, *Appellants,*
*v.*
DAVIS et al, *Respondents.*
(TC 3636)

THE LOMAS & NETTLETON COMPANY,
*Respondent,*
*v.*
SKYLINE ENTERPRISES, INC., *Defendants,*
HIGH et al, *Appellants.*
(TC 3630, SC P-2486)

584 P2d 725

[ 316-a ]

Brad Littlefield, of Goldsmith, Siegel, Engel and Littlefield, Portland, argued the cause and filed the briefs for appellants.

Gile R. Downes, of Jensen, DeFrancq, Holmes & Schulte, Portland, argued the cause for respondents The Lomas & Nettleton Company and Lomas and Nettleton Financial Corporation. With him on the brief was Ted Jensen, of Jensen, DeFrancq, Holmes & Schulte, Portland.

TONGUE, J.

Lent, J., specially concurring.

[ 316-b ]

## TONGUE, J.

These two suits were consolidated on appeal because of the identity of issues raised. In the first case filed Wallace High and others (hereinafter "claimants") sought a declaratory judgment that they were entitled to exclusive and perpetual hunting, fishing and recreational rights on certain real property formerly owned by Luther Davis and that their rights were superior to the rights of Lomas & Nettleton. The second case was a suit by Lomas & Nettleton to foreclose the two mortgages it had on that real property.

The trial court held that although Lomas & Nettleton had some knowledge that there might be claimed rights to hunting and fishing privileges, the documents purporting to convey the interests did not adequately describe the property and did not give claimants an interest in the property superior to the mortgages. Upon de novo review of the evidence we reverse the decree of the trial court.

*Summary of facts.*

These suits involve the assertion by the claimants of hunting, fishing and recreational rights on property known as the Luther Davis Ranch, a large body of land located in Wasco, Sherman and Gilliam Counties. Davis was interested in developing the property for an exclusive hunting and fishing club. As part of his overall plan he sold the property by land sale contract to Devsal, Inc., which was to proceed with the sale of memberships in the development. The contract also contemplated that the "operation" would be transferred to the John Day Recreational and Development Corporation (JDRDC) which would promote and sell memberships. It was also agreed that Davis would execute documents granting the purchasers of memberships the exclusive right to hunt, fish and use the property in perpetuity and that these documents would be separately recorded as encumbrances on the property. Before JDRDC actually sold the membership

[ 317 ]

agreements various amendments were made to the land sale contract to facilitate the development of the property and the sale of memberships. Devsal later assigned its interest in the land sale contract to JDRDC, but this took place after the execution of all of the membership agreements which are at issue in this case.[1]

---

[1]The chronology of these and other relevant transactions, according to the record, is as follows:

| DATE | TRANSACTION |
| --- | --- |
| Sometime prior to Sept. 13, 1956. | Land sale contract between Davis and Devsal. |
| February 16, 1965. | Agreement between Devsal and JDRDC that Devsal would transfer interest in ranch in exchange for 51 percent of JDRDC capital stock. |
| September 7, 1965. | Membership agreement of Wallace High. |
| September 14, 1965. | Amendment to land sale contract. |
| September 30, 1965. | Membership agreement of Charles Milbrandt. |
| October 21, 1965. | Modification of land sale contract. |
| October 28, 1965. | Membership agreement of Robert S. Lovell. |
| December 1, 1965. | Membership agreement of Richard G. Atchison. |
| December 5, 1965. | Membership agreement of Floyd T. Morrell. |
| December 13, 1965. | Membership agreement of James McFarlan. |
| January 23, 1967. | Devsal involuntarily dissolved by corporation commissioner. |
| October 5, 1967. | Morrell membership agreement recorded. |
| June 13, 1968. | Land sale contract recorded; High, Milbrandt, Atchison membership agreements recorded. |
| August 14, 1968. | JDRDC dissolved by corporation commissioner. |
| August 19, 1968. | Assignment by Devsal of vendee's interest in land sale contract to JDRDC. |
| August 19, 1968. | Quitclaim deeds whereby Devsal conveyed to JDRDC property in Sherman and Gilliam Counties. |
| August 19, 1968. | Release by Devsal and JDRDC of obligations under agreement of February 16, 1965. |
| January 21, 1970. | JDRDC reinstated by corporation commissioner. |
| October 1970. | Assignment to Davis by JDRDC of vendee's interest in land sale contract. |
| November 14, 1970. | Quitclaim deed executed by Wallace High releasing to Davis High's interest in his membership agreement. |

Apparently the development never got off the ground, although a small number of memberships had been sold. Eventually the vendee's interest in the land sale contract was assigned back to Davis. Davis subsequently conveyed the property to Skyline, Inc., which borrowed the money and issued the mortgages that are the subject of the foreclosure suit.

■ As previously noted, the trial court held that although Lomas & Nettleton may have had notice or knowledge of the membership agreements, that notice or knowledge, even coupled with the other information available to Lomas & Nettleton, was not sufficient "to create a permanent interest in land which would have priority over a subsequent purchaser or mortgage." The trial court held that it did not need to reach the question whether the membership agreements were valid as between the parties to them. We disagree with this approach. In our view, the controlling question to be decided in this case is whether the membership agreements conveyed interests in the land to the claimants. If they did then, in our opinion, claimants would have priority over all but bona fide purchasers without notice of their interests.[2]

| | |
|---|---|
| August 31, 1971. | Warranty deed from Davis to Skyline Enterprises, Inc. |
| September 9, 1971. | Mortgage from Skyline Enterprises, Inc., to Lomas & Nettleton Financial Corp. to secure promissory note of $700,000. |
| September 27, 1971. | Mortgage from Skyline Enterprises, Inc., to Lomas & Nettleton Financial Corp. to secure promissory note of $350,000. |
| December 3, 1971. | Lovell membership agreement recorded. |
| October 15, 1973. | Assignment of mortgages from Lomas & Nettleton Financial Corp. to Lomas & Nettleton Co. |

[2]We agree with the finding of the trial court that Luther Davis was the fee simple owner of the property and that it was not necessary for his wife to join in the land sale contract to Devsal. Consequently, Mrs. Davis' failure to sign the amendments to the contract has no bearing on the validity of Devsal's assignment of the vendee's interest to JDRDC.

*The validity of the membership agreements.*

A. *JDRDC could convey the hunting and fishing rights to the Luther Davis ranch.*

Lomas & Nettleton contends that claimants could not have acquired any rights because during the period in which the membership agreements were executed, September to December 1965, JDRDC had no interest in the property and that its subsequent acquisition was null and void.

The record reveals that between September and December 1965, when the membership agreements were executed, Luther Davis had the vendor's interest (legal title) and Devsal had the vendee's interest (equitable title). It was not until August 19, 1968, that Devsal assigned its vendee's interest to JDRDC. In other words, notwithstanding the recital in the membership agreements that "John Day Recreational Development Company is the owner of a large body of land," JDRDC in fact had no interest in the land at that time.

Lomas & Nettleton's contention overlooks the fact that ORS 41.350(3) conclusively presumes, between the parties, the truth of the recitals in a written instrument. It follows that JDRDC and its successors in interest, including Lomas & Nettleton, are bound by the recital that JDRDC owned the property. *Cf. Emmons et al v. Sanders et al,* 217 Or 234, 241, 342 P2d 125 (1959).[3]

However, a further complication is introduced in this case. On January 23, 1967, Devsal was involuntarily dissolved by the corporation commissioner and on August 14, 1968, JDRDC was involuntarily dissolved. It was later reinstated, but on August 19, when

---

[3]The same result follows under familiar equitable principles. Devsal assigned its vendee's interest to JDRDC on August 19, 1968. JDRDC would, therefore, be estopped to deny its power to convey interests in the land to the membership subscribers. *Cf. Taggart v. Risley,* 4 Or 235, 241 (1872). *See also* 2 Pomeroy, Equity Jurisprudence 865, § 658 (5th ed 1941); 4 Tiffany, Law of Real Property 1103, § 1230 (3d ed 1975). JDRDC's successors in interest are similarly estopped. *Taggart v. Risley, supra.*

[ 320 ]

Devsal assigned its vendee's interest to JDRDC, neither corporation was in legal existence.

ORS 57.630(2) provides:

> "Whenever any such corporation is the owner of real or personal property, or claims any interest or lien whatsoever in any real or personal property, such corporation shall continue to exist during such five-year period for the purpose of conveying, transferring and releasing such real or personal property or interest or lien therein, * * *."

Thus, Devsal was able to convey its vendee's interest even after its dissolution. However, Lomas & Nettleton contends that JDRDC could not accept the conveyance while it was involuntarily dissolved, citing *Klorfine v. Cole,* 121 Or 76, 82, 85, 252 P 708, 254 P 200 (1927). This court held in that case that a purported conveyance to a dissolved corporation was a nullity because the corporation was "civilly dead." The question in the instant case is whether JDRDC's reinstatement by the corporation commissioner on January 21, 1970, validated transactions made during the period of suspension.

There is a split of authority on the question whether reinstatement of a repealed corporate charter validates all acts of the corporation in the interim period of suspension. *See* Annot., 13 ALR2d 1220 (1950). While some states hold that reinstatement "relates back" to the time of repeal, this court has held that reinstatement does not cancel the dissolution *ab initio, Lents, Inc. v. Borstad,* 251 Or 296, 299, 445 P2d 597 (1968). The opinion in that case notes, however, that the court was not there concerned with the validation of corporate acts between dissolution and reinstatement. In *Gillen-Cole Co. v. Fox & Co.,* 146 Or 208, 224, 29 P2d 1019 (1934), this court held that a reinstated corporation ratified what had been done on its behalf during the period of suspension.[4] JDRDC, after reinstatement, assigned the vendee's interest in the land sale contract back to Davis. This action, in our

---

[4] *Cf. Deschutes Co. v. Lara et al,* 127 Or 57, 73, 270 P 913 (1928).

[ 321 ]

opinion, was ratification by JDRDC of the acceptance on its behalf of the benefits of the contract while the corporation was dissolved.

B. *The membership agreements did not violate the Statute of Frauds.*

Claimants' purported interest in the property based upon their membership agreements can be classified as a "profit a prendre." In *Bingham v. Salene,* 15 Or 208, 214 (1887), this court stated that the right to take something from the land of another, including hunting and fishing, is a "profit a prendre." The element of participation in the soil and its produce distinguishes a profit from an easement. A grant of a profit a prendre is a grant of an interest in the land itself, and within the statute of frauds. *Id.* at 212-13. *See also* Hahner, *An Analysis of Profits A Prendre,* 25 Or L Rev 217, 218, 233 (1946).

The parties both recognize that the central issue in these cases is the adequacy of the property description in the membership agreements to satisfy the statute of frauds, ORS 41.580.[5] Claimants also contend that Lomas & Nettleton is a "stranger" to these agreements and is precluded from raising the statute of frauds. This contention may well have merit. *See Ringler v. Ruby,* 117 Or 455, 244 P 509 (1926), and *City of Medford v. Bessonette,* 255 Or 53, 58, 463 P2d 865 (1970). We need not decide that question, however, because we find the property description to be adequate, for reasons which we shall now discuss.

It is conceded that the location of the land and its description cannot be determined from the member-

---

[5] ORS 41.580 provides:

"In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by his lawfully authorized agent; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law:

"* * * * *

"(5) An agreement for the leasing for a longer period than one year, or for the sale of real property, or of any interest therein."

ship agreements alone. Lomas & Nettleton argues that the description in the agreements is patently ambiguous and that, for this reason, no extrinsic evidence can be admitted to identify the property covered by the agreements, citing *Hertel v. Woodard,* 183 Or 99, 191 P2d 400 (1948); *Bingham v. Honeyman,* 32 Or 129, 51 P 735 (1898); *Noyes v. Stauff,* 5 Or 455 (1875).

Although this court has, in the past, sometimes used the terms "latent" and "patent" in deciding when an ambiguity in a land description can be explained by extrinsic evidence, our recent decisions have avoided the use of those terms, and with good reason. They are misleading, in our opinion, as is the suggested conclusion that extrinsic evidence will be freely admitted in the one instance but not in the other.[6]

■ When the results of our prior cases are examined, it is apparent that the real issue, when the sufficiency of the description of land in a contract subject to the statute of frauds is challenged, is whether the written description, in light of the ascertainable objective facts and without resort to evidence of the parties' intentions or oral discussions of the transaction, can be said with reasonable certainty to apply only to one specific, identifiable, piece of property. If so, the writing is sufficient under the statute of frauds, although a complete description of the property may have to be obtained from other sources. For example, in *Kallstrom v. O'Callaghan,* 259 Or 210, 485 P2d 1200 (1971), the writing (after reformation to correct a conceded error) described the property as "the approx. 2 acre parcel located directly North and contiguous to 19705 S.W. Boones Ferry Rd.—Tualatin, Oregon." Extrinsic evidence showed that there was only one parcel of land, consisting of two acres, directly north of and contiguous to the address given. And in *Burns v. Witter,* 56 Or 368, 108 P 129 (1910), the property was

---

[6]The purported rule has been described as a thoroughly discredited misunderstanding of a maxim laid down by Sir Francis Bacon. *See* McBaine, *The Rule Against Disturbing Plain Meaning of Writings,* 31 Calif L Rev 145, 147 (1943).

described in the writing as "my farm containing 40 acres." The memorandum did not mention the location of the property, or state where the agreement was executed. The court held that if the proof showed that the sellers only owned one farm, and that that farm consisted of 40 acres, the writing was sufficiently definite for enforcement. *See also Phillips v. Johnson,* 266 Or 544, 514 P2d 1337 (1973); *Sherwood v. Gerking,* 209 Or 493, 306 P2d 386 (1957) (broker's contract); *Wurzweiler v. Cox,* 138 Or 110, 5 P2d 699 (1931); *Bloech v. Hyland Homes Co. et al,* 119 Or 297, 247 P 761 (1926); *Flegel v. Dowling,* 54 Or 40, 102 P 178 (1909); *Bogard v. Barhan,* 52 Or 121, 96 P 673 (1908); *House v. Jackson,* 24 Or 89, 32 P 1027 (1893). *But see Hughes v. Evans,* 64 Or 368, 130 P 639 (1913) (result disapproved in *Sherwood v. Gerking, supra*).

■ If, on the other hand, extrinsic evidence discloses that a written description can, with equal accuracy, apply to more than one piece of property, the writing will be held insufficient, and parol evidence will not be permitted to explain which of the possible properties the parties intended to describe. In such a case the statute of frauds serves its intended function by preventing the enforcement of an agreement when the subject matter of the writing can be ascertained only by parol evidence of the parties' agreement. ORS 41.580 forbids evidence, other than the writing, "of the agreement." *See* n. 5, *supra.*

For example, in *Meadowlark Inv. Corp. v. Croeni,* 237 Or 535, 392 P2d 327 (1964), the description in the writing (at 537) was:

"Residence and property belonging to Susan Lehman located at 3805 N.W. Saltzman Road Portland 10, Oreg. Said property consists of approx. 39 acres and fronts on two sides of N.W. Thompson Road and one side by Saltzman Road. * * *"

On its face this description appears to be more specific than many others which have been held enforceable. Extrinsic evidence, however, showed that the seller's property contained more than 46 acres, and that both

the street address and the road frontage references in the writing applied to the entire parcel. Therefore, the description in the writing did not provide any way to determine which 39 acres out of the 46 or more described were the subject of the agreement. Parol evidence was not admissible to show which 39 acres the parties actually intended. To admit such evidence would have been to admit evidence other than the writing of the agreement itself. The agreement was held unenforceable. For similar decisions holding writings unenforceable after considering evidence or allegations which showed that the description in the writing could be applied, with equal accuracy, to more than one piece of land, *see Hink et ux v. Bowlsby et al,* 199 Or 238, 260 P2d 1091 (1953); *Trumbly et al v. Fixley,* 178 Or 458, 168 P2d 571 (1946); *Woolsey v. Draper et al,* 103 Or 103, 201 P 730, 203 P 582 (1921).

In all of the above cases, whether the writing was ultimately held enforceable or unenforceable, extrinsic evidence was examined or held admissible in order to determine whether the description in the writing, when read in light of known facts about the parties and the property purportedly covered, was fatally ambiguous. In none of them was parol evidence of the parties' understanding or oral agreement allowed to cure such an ambiguity if extrinsic evidence showed it to exist.

■ Sometimes it may appear from the description itself, without the need to consider extrinsic evidence, that the description could apply to more than one piece of property. *See,* for example, *Coast Brokers v. Hickman,* 239 Or 121, 396 P2d 756 (1964) ("two tracts of land one of 5 acres and one of 7 acres adjoining Honeyman park south of Florence."); *Hertel v. Woodard,* 183 Or 99, 191 P2d 400 (1948) ("lot and house number 960 Union Street" but no indication of city, county, or state, or that seller presently owned the lot and house to be conveyed); *Noyes v. Stauff,* 5 Or 455 (1875) ("house which is to be in construction"). *See also Hyland v. Oregon Agricultural Co.,* 111 Or 212,

[ 325 ]

225 P 728 (1924); *Bingham v. Honeyman,* 32 Or 129, 51 P 735 (1898); *Whiteaker v. Vanschoiack,* 5 Or 113 (1873). In these cases, because it is apparent from the face of the writing that the ambiguity cannot be cured without resort to parol evidence of the parties' intentions, the writing is held unenforceable.

To summarize, if it is clear from the face of the writing that the description could apply with equal accuracy to more than one piece of property, it is unenforceable by reason of that fact. If the written description might possibly apply to but one piece of land, evidence is admissible to determine whether there is only one, or more than one, to which it might apply. If it can be determined with reasonable certainty that there is only one, the written description is sufficiently definite to meet the requirements of the statute of frauds although the complete description must be supplied from other sources. If, however, the extrinsic evidence demonstrates that there is more than one piece of property to which the description in the writing can accurately apply the description is ambiguous and the writing will be held insufficient. This is essentially what this court said in *Burns v. Witter,* 56 Or 368, 371, 108 P 129 (1910):

"If, on its face, the memorandum contains such a specification of real property that by the aid of parol testimony the description given can apply to only one particular tract of land, it is sufficient; but if it appear, from extrinsic evidence, that the delineation set forth can refer to more than one parcel, the ambiguity is patent and the instrument void for uncertainty * * *."[7]

---

[7]The textwriters on real property transactions do not discuss the problem of the sufficiency of land descriptions or the admissibility of extrinsic evidence in the terms we have employed here. We have reexamined the results of our cases and described what we have done because we find the traditional treatment of these questions not particularly helpful. *See,* for example, 4 Tiffany, Real Property 229, § 997 (3d ed 1975):

"In all instruments for conveyance of land, the description thereof must be sufficiently definite and certain upon the face of instrument itself, or in some other writing referred to, that the land can be identified with reasonable certainty; otherwise the instrument is void

The facts of our cases illustrate some of the kinds of extrinsic evidence which can show that the writing can apply to only one piece of land. If, for example, the writing refers to "my ranch" or "his residence" and to the general location, extrinsic evidence may show that the seller owns only one ranch or residence in that area, and that it conforms to other characteristics mentioned in the writing. *See, e.g., Burns v. Witter, supra; Bogard v. Barhan,* 52 Or 121, 96 P 673 (1908); *cf. Henderson v. Lemke,* 60 Or 363, 119 P 428 (1911) (broker's contract). Or the evidence may show that there is but one piece of property in the area which is described by a distinctive name which is employed in the writing. *See, e.g., Sherwood v. Gerking,* 209 Or 493, 306 P2d 386 (1957); *Wurzweiler v. Cox,* 138 Or 110, 5 P2d 699 (1931); *Bloech v. Hyland Homes Co. et al,* 119 Or 297, 247 P 761 (1926); *Flegel v. Dowling,* 54 Or 40, 102 P 178 (1909); *House v. Jackson,* 24 Or 89, 32 P 1027 (1893). Recitals in the writing as to where the parties reside or where the writing was executed can be used as an indication of the general area in which the property is located, and may combine with extrinsic evidence to show that the applicability of an otherwise general description is sufficiently limited.

under the Statute of Frauds. Generally, however, a written description suffices to satisfy the statute if it is sufficiently definite, with the aid of extrinsic evidence, to identify the land sought to be described. Under the rule a latent but not a patent ambiguity may be resolved by extrinsic evidence." (Footnotes omitted)

*See also* 6 Thompson on Real Property 462-67, §§ 3025, 3026 (1962); 3 Casner, American Law of Property 19-20, § 11.5 (1952). The inconsistent results which the traditional rules have produced can be seen in the cases collected in Annot., Sufficiency of Description or Designation of Land in Contract or Memorandum of Sale, under Statute of Frauds, 23 ALR2d 6 (1952).

Professor Corbin argues for a liberal approach to testing the adequacy of the description, and does not make it clear whether he would or would not allow evidence of the parties' oral agreements or their understanding of the transaction itself. 2 Corbin on Contracts 718-19, § 505 (1950). As we have indicated, we have found sufficient guidance in the results of our prior cases for the decision now before us. The parties have not argued, and we need not here consider, whether parol evidence of the parties' negotiations or intentions should ever be admissible.

[ 327 ]

*See Wurzweiler v. Cox, supra; Flegel v. Dowling, supra; Bogard v. Barhan, supra.* There are, undoubtedly, other kinds of extrinsic evidence which can indicate that the written description, although general in terms, can with reasonable certainty be applied to a given piece of property and no other.

Thus, the problem in this case is to determine whether, in light of the available extrinsic evidence other than that of the parties' negotiations and intentions, the language of the membership agreements applies with reasonable certainty to a single identifiable piece of property and no other. The agreements, all of which are identical in this respect, recite that:

> "* * * John Day Recreational Development Company is the owner of a large body of land consisting of some 18,000 acres owned in fee * * * and * * * said land has a frontage upon the John Day River and its tributaries approximating 35 miles, and * * * the John Day Recreational Development is developing the said premises for an exclusive hunting and fishing club * * *."

The agreements also contain the additional information that "Luther W. Davis, et ux" are "holders in fee," and that the premises are to be known and referred to as the "High Country."

The agreements make no mention of the state or general area where the land in question is located. The only John Day River in the United States listed in standard reference works is in Oregon.[8] Actually, there are two John Day Rivers in Oregon, one in the eastern portion of the state and one in Clatsop County.[9] Other references in the agreements, however, when read in light of the extrinsic evidence, make it clear that the reference in those agreements is to the well-known John Day River in eastern Oregon.

---

[8] The Times Atlas of the World, index at 26 (Mid-Cent ed 1957); 30 Encyclopedia Americana 369 (1957).

[9] *See* McArthur, Oregon Geographic Place Names 327 (3d ed 1952).

[ 328 ]

The record does not show that JDRDC owned any land in the area at the time the agreements were executed. There is, however, evidence that Luther Davis owned a "large body of land" in the John Day River area, with an unspecified amount of frontage on the river and its tributaries, and that Davis, at that time, believed that his wife was a co-owner.

The reference in the agreements to the Davis ownership does not, alone, serve to identify the property covered by the writings because Davis, either individually or with his wife, owned adjoining property, under cultivation, which was not being "developed" by JDRDC. However, the record does establish the following: Devsal was the equitable owner, by virtue of a land sale contract containing a complete description, of a portion of the Davis property. The contract contemplated a transfer to JDRDC, which would promote and sell memberships constituting rights in that land. Devsal owned and controlled JDRDC. JDRDC was, at the time the membership agreements were executed, actively promoting memberships in an "exclusive hunting and fishing club" with membership rights to be exercised on that same land. It was not involved in the development or promotion of any other hunting and fishing club."

When all of this evidence is considered together it establishes with reasonable certainty, in our opinion, that a specific piece of property—that described in the land sale contract between the Davises and Devsal—was the only property to which the membership agreements could apply.[10] It follows, in our judgment,

---

[10]There is one difficulty with this conclusion which we have not overlooked—the recital in the membership agreements that the property in question consists of "some 18,000 acres." The property described in the land sale contract amounts to slightly more than half that number of acres. However, this discrepancy is not fatal to the enforceability of the agreements. The evidence leaves no doubt that the "High Country" area which was being promoted by JDRDC was only that described in the contract. The extrinsic fact which limits the applicability of the member-

that the purposes of the statute of frauds were satisfied: the subject matter of the membership agreements can be determined from the writings and other evidence, without the necessity of considering testimony by the parties to those agreements about their intentions or negotiations. For these reasons, we hold that the membership agreements are specific enough to be enforceable.

## C. *Not all of the claimants are entitled to the recreational rights.*

The trial court noted that there are questions as to whether two of the claimants, High and Stearns, are entitled to the recreational rights because High quitclaimed his interest back to Davis and Stearns could not produce his membership agreement at trial.

On November 14, 1970, High executed a quitclaim deed whereby he released his right, title and interest in his membership agreement to Luther Davis.[11] High concedes that this deed was delivered to Davis but contends that the deed was executed and delivered at Davis' request to remove a cloud on his title and on the condition that it would be binding only if Davis executed another agreement permitting the members to hunt and fish on the property and only if all of the other members would sign similar quitclaim deeds.

■■■■ There is a critical distinction between a conditional delivery of a deed and a conditional conveyance. To be effective a delivery must be unconditional or any conditions must be satisfied. Parol evidence is admissible to determine whether in fact there has been a valid delivery. *See Putnam et ux v. Jenkins et ux,* 204 Or 691, 724-25, 285 P2d 532 (1955); *Lancaster v. May,*

---

ship agreements is JDRDC's activity with respect to the land. The statement of acreage in those agreements is erroneous, but does not create an ambiguity, in our opinion.

[11]There is insufficient evidence to support Lomas & Nettleton's contention that "similar quitclaim deeds were executed and delivered by each of High et al except Richard Atchison."

*as Administrator,* 194 Or 647, 654, 243 P2d 268 (1952). *See also* 26 CJS, Deeds § 48 (1956). However, it is a general rule that "placing a grantee in possession of a deed absolute on its face constitutes delivery and transfers title to him regardless of the imposition of any collateral condition or contingency as to its operative effect." 3 Casner, American Law of Property 316-17, § 12.66 (1952). Parol evidence is not admissible to show that a deed which has been executed and delivered is subject to any conditions not appearing on the face of the deed. 32A CJS, Evidence § 940 (1964). *See also Harmon v. Grants Pass B. & T. Co.,* 60 Or 69, 75, 118 P 188 (1911). Therefore, the execution and delivery of the quitclaim deed precludes High from now asserting rights under his membership agreement.

Stearns testified that he was issued an executed copy of the agreement on the same day as Milbrandt, but that he did not know what happened to it. He also testified that he originally issued a note for $2,000 as consideration but that the note was canceled and Stearns was given the membership in exchange for promotional and other work he had done for JDRDC. Stearns hunted and fished on the property in 1965 and 1966. Stearns' testimony was corroborated by Milbrandt who testified that he was present when Stearns' membership agreement was executed.

The statute of frauds, ORS 41.580, provides that evidence of an agreement for the sale of an interest in real property must be proved by the writing or secondary evidence of its contents. Stearns has attempted to prove by oral testimony that there was a writing and the contents thereof. Normally such evidence would be precluded by the "best evidence rule," ORS 41.640, until the party shows that he could not produce the original writing in a reasonable time by the exercise of a reasonable effort to do so. *Velasquez v. Freeman,* 244 Or 40, 47, 415 P2d 514 (1966).

Objection was made to the introduction of this evidence on the basis of the "best evidence rule" but

the objection was overruled because Stearns "indicated he didn't know what happened to it." Technically speaking, the trial court should not have admitted the secondary evidence before determining the extent of Stearns' diligence in searching for the document, *Velasquez, supra.* We note, however, that the evidence overwhelmingly points to the fact that Stearns' membership agreement was identical in form and content to all the other membership agreements involved in this case. Under such circumstances the following quotation from McCormick, Handbook on the Law of Evidence 577-78, § 243 (2d ed 1972), is appropriate:

> "* * * [T]he requirement of the production of original writings, with the several excuses for nonproduction and the exceptions to the requirement itself, make up a fairly complex set of regulations for administration by the trial judge. Mistakes in the application of these rules are, understandably, not infrequent. The purpose of this system of rules, on the other hand, is simple and practical. That purpose is to secure the most reliable information as to the contents of documents, when those terms are disputed. A mystical ideal of seeking 'the best evidence' or the 'original document,' as an end in itself is no longer the goal. Consequently when an attack is made, on motion for new trial or on appeal, upon the judge's admission of secondary evidence, it seems that the reviewing tribunal, should ordinarily make inquiry of the complaining counsel, 'Does the party whom you represent actually dispute the accuracy of the evidence received as to the material terms of the writing?' If the counsel cannot assure the court that such a good faith dispute exists, it seems clear that any departure from the regulations in respect to secondary evidence must be classed as harmless error. [Footnote omitted]"

We find as a fact that Stearns was issued a membership agreement identical in terms to those of the other members and is able to assert the rights created by the agreements.

*The issue of notice.*

For Lomas & Nettleton's mortgage to be superior to the rights of the claimants, it must have taken its

[ 332 ]

mortgage in good faith for value and without notice of the outstanding interests. *See Landigan v. Mayer,* 32 Or 245, 252, 51 P 649 (1898). The notice that will deprive the mortgagee of priority can be either actual or constructive. Actual notice is direct knowledge of the outstanding interest. *See Seguin et al v. Maloney-Chambers,* 198 Or 272, 285, 253 P2d 252, 256 P2d 514 (1953). Constructive notice encompasses both notice chargeable under the recording statute, ORS 93.710, and "inquiry notice." *See Belt et ux v. Matson et al,* 120 Or 313, 321, 252 P 80 (1927).

■   Lomas & Nettleton was not charged with record notice because the membership agreements were not properly acknowledged before recordation. ORS 93.480; 8 Thompson on Real property 302-16, § 4304 (1963). If Lomas & Nettleton or an agent nevertheless had checked the record the company would then have had actual notice of the interests asserted by claimants. We find no evidence that Lomas & Nettleton had actual notice either by virtue of checking the records or otherwise.

■   We do find, however, that Lomas & Nettleton had "inquiry notice." Before loaning funds to Skyline Enterprises, Inc., Lomas & Nettleton received a preliminary title report from a title company containing the following exceptions:

> "6. The right, title and interest of John Day Recreational Development Company, evidenced by the issuance of Founders memberships in an exclusive hunting and fishing club on the above premises, some of which are recorded.

> "7. The right, title and interest of the membership holders described at No. 6 above."

The title insurance policies, as issued, also include exceptions for "the right, title and interest of membership holders in and to an exclusive hunting and fishing club under the rights and interests of the John Day Recreational Development Company."

We hold that under these circumstances Lomas & Nettleton had a duty to inquire of the organization or members asserting hunting and fishing rights to determine the extent of the interest claimed. Lomas & Nettleton failed to make such inquiry, but is now charged with notice of the facts that would have been discovered by such an inquiry. *Belt et ux v. Matson et al, supra.* It follows that Lomas & Nettleton's security interest has no priority over the interests of claimants.

*Miscellaneous contentions.*

A. *Lomas & Nettleton cannot assert a purported violation of the securities law.*

Lomas & Nettleton contends that the sales of membership agreements were sales of securities and the failure to register these securities made their sale "void" under ORS 59.250, which was in force at the time of sale but has since been repealed. We need not decide whether the sale of membership agreements constitued the sale of securities because even if it did, Lomas & Nettleton has no standing by reason of the fact that it was not a party to the alleged illegal transaction. *See Austin v. Hallmark Oil Co.,* 21 Cal 2d 718, 134 P2d 777, 783 (1943), and *Gerhard v. Stephens,* 68 Cal 2d 864, 442 P2d 692, 732 (1968), decided under the California statute (Cal Corp Code § 26100 (1965)), which also provided that sales of securities without a permit were "void." *See also* Loss and Cowett, Blue Sky Law 131-33 (1958).

B. *A declaration that the membership agreements are valid is not inequitable.*

Lomas & Nettleton contends that allowing the membership agreements priority over its mortgages would yield an inequitable result in that the claimants had unclean hands and would be unjustly enriched.

There was no evidence that a violation of the securities law, if there was one, was knowing or intentional. We do not believe that under the circumstances of this case the claimants can be said to have

"unclean hands." At any rate, the issue is the priority of interests in the foreclosure suit and this is not affected by any purported violation of the securities law.

We also do not believe that the claimants will be unjustly enriched. They are receiving what they bargained and paid for.

C. *Lomas & Nettleton is not subrogated to the rights of lienholders whose claims were paid from the proceeds of the mortgages.*

Lomas & Nettleton contends that the funds it supplied to Skyline were used to discharge other liens which were prior to the interests of the claimants and that consequently it should be subrogated to the rights of the prior lienors to the extent those liens were paid by its funds. It is possible for a mortgagee to be subrogated to the rights of a prior lienor. *See* Annot., Subrogation to Prior Lien of One Who Advances Money to Discharge It and Takes New Mortgage, as Against Intervening Lienor, 70 ALR 1396 (1931); 83 CJS 645-46, Subrogation § 36 (1953). However, the principles which permit subrogation in these instances are equitable. Lomas & Nettleton had notice of the existence of membership agreements creating hunting and fishing rights, and chose to proceed with the mortgage transaction without further investigation. Under these circumstances, there are insufficient equities in its favor to convince us that it should be subrogated to the rights of prior lienors whose liens were discharged out of the mortgage proceeds, and thus to foreclose those hunting and fishing rights.

In summary, then, we hold that except for High, who quitclaimed to Davis the rights he had acquired under his membership agreement, the claimants have interests in the property, by virtue of their membership agreements, which are superior to that of Lomas & Nettleton. The case is remanded for modification of the foreclosure decree in accordance with this opinion.

**LENT, J.,** specially concurring.

I concur in the result and with the basic approach to that result. I must express my reservations, however, concerning the use of the term "reasonable certainty" to describe the quantum of persuasion necessary to establish a real property description by extrinsic evidence so as to avoid the impact of the Statute of Frauds.

The term is merely a label which has no precise meaning; therefore, the trier of fact has a task impossible to perform upon a logical basis. If the court requires that the evidence to establish the property description be more than that necessary to establish the affirmative of the issue by a preponderance of the evidence, the court should candidly say so. If that is what *is* meant by use of the term, I would then dissent for reasons to which I have alluded earlier. *See Hardwick v. Dravo Equipment Company,* 279 Or 619, 630, 569 P2d 588 (1977) (Lent, J., specially concurring). *Compare, Jensen v. Miller,* 280 Or 225, 229, 570 P2d 375, 377 (1977), footnote 1.

That this court has used the term in such ways as to illustrate its inherent imprecision appears from a comparison of its use in *Dravo* with its use in *Cont. Plants v. Measured Mkt.,* 274 Or 621, 624, 547 P2d 1368 (1976). In *Dravo* the term was used to describe some measure greater than mere probability, while in *Cont. Plants* the court said that it meant no more than probability. It is true that both cases were concerned with the sufficiency of evidence to establish damages; however, I think that is a difference without distinction. The fact remains that the term is imprecise and tends to confuse.